Filed 9/17/21 (unmodified opn. attached)
<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C081843 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F05054 ) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| RYAN DOUGLAS ROBERTS, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Gerrit W. Wood, Judge. Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Clara M. Levers, Deputy Attorney General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II through VIII.

1

THE COURT:

It is ordered that the partially published opinion filed on August 20, 2021 be modified as follows:

1.	In the first line of the last paragraph on page 72, replace Sheldon with Shelton.

2.	On page 74, delete footnote 31.

3.	On page 74, after the second-to-last sentence in the first full paragraph, add the following:

Defendant also argues that the Juggalo's " 'proclivity toward stabbing, cutting, and hacking victims was crucial to the jury's understanding of why, if [S.L.] was involved, she would engage in the type of assault she did to a person who was arguably her good friend.' "

That paragraph will now read as follows:

Defendant asserts that the trial court erred in excluding relevant defense evidence because Shelton was sufficiently qualified to give expert opinion evidence. Defendant further asserts that Shelton's testimony would have been relevant to his third party culpability theory. He contends it was error for the trial court to limit Shelton's proposed testimony to " 'what a Juggalo is in general' " merely because Shelton had not reviewed case materials and because he did not have " 'hands on' " experience investigating Juggalo homicides in Sacramento. He also asserts the evidence established motive and opportunity for S.L. to commit the murder, and, because the murder was consistent with overkill murders committed by Juggalos, the testimony provided a motive for the manner in which S.L. killed Jessica. Defendant also argues that the Juggalo's " 'proclivity toward stabbing, cutting, and hacking victims was crucial to the jury's understanding of why, if [S.L.] was involved, she would engage in the type of assault she did to a person who was arguably her good friend.' " Defendant maintains that the trial court's error violated his state and federal constitutional rights to present a defense, to confront and cross-examine witnesses, to due process, and to a fundamentally fair trial.

4.	On page 76 in footnote 32, delete the two sentences that read, "However, defendant never posed such a question to Shelton during the Evidence Code section 402 hearing. Nor did he request to reopen the hearing to allow him to do so," and replace those sentences with the following:

2

But defendant never posed such a hypothetical question to Shelton during the Evidence Code section 402 hearing. Evidence Code section 402 hearings are held to determine the admissibility and scope of testimony. And the trial court's tentative ruling did not preclude defendant from asking a hypothetical question at the hearing. Indeed, the trial court indicated its tentative ruling could change. The court stated: "Between now and whenever this expert would take the stand, we are going to be hearing from a lot of other people, which could . . . move the relevance of this expert in one direction or another. I have no idea." Yet, defendant did not ask the hypothetical in the hearing held to determine the admissibility and scope of the expert testimony, despite our high court's expressed preference for hypothetical questions in the context of such gang expert testimony. (*Vang*, at pp. 1045, 1047, 1048.) Moreover, even in the face of prosecutor's argument and the trial court's ruling after Shelton testified at the hearing, defendant did not request to reopen the hearing to allow him to ask Shelton to opine, based on a hypothetical question mirroring the facts of the case, whether in his opinion the killing here was consistent with a Juggalo murder.

5.      In the last sentence of footnote 32, delete the word "Again" and "[a]." That

sentence will now read:

> " 'A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Holford*, *supra*, 203 Cal.App.4th at p. 169.)

Footnote 32 will now read as follows:

On appeal, defendant asserts Shelton could have offered an opinion based on a hypothetical question. We agree that experts may offer such opinions. " ' "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.]" ' [Citation.] ' "Such a hypothetical question must be rooted in facts shown by the evidence . . . ." ' " (*People v. Ewing* (2016) 244 Cal.App.4th 359, 382, quoting *People v. Vang* (2011) 52 Cal.4th 1038, 1045, 1047, 1048.) Consequently, here it was theoretically possible Shelton could have offered an opinion to whether a hypothetical situation mirroring certain facts of this case was consistent with a Juggalo killing. But defendant never posed such a hypothetical question to Shelton during the Evidence Code section 402 hearing. Evidence Code section 402 hearings are held to determine the admissibility and scope of testimony. And the trial court's tentative ruling did not preclude defendant from asking a hypothetical question at the hearing. Indeed, the trial court indicated its tentative ruling could change. The court stated: "Between now and whenever this expert would take the stand, we are going to be hearing from a lot of other people, which could . . . move the relevance of this expert in one direction or another. I have no idea." Yet, defendant did not ask the hypothetical in the hearing held to determine the admissibility and scope of the expert testimony, despite our high court's expressed preference for hypothetical questions in the context of such gang expert testimony. (*Vang*, at pp. 1045, 1047, 1048.)

3

Moreover, even in the face of prosecutor's argument and the trial court's ruling after Shelton testified at the hearing, defendant did not request to reopen the hearing to allow him to ask Shelton to opine, based on a hypothetical question mirroring the facts of the case, whether in his opinion the killing here was consistent with a Juggalo murder. Consequently, his contention on appeal as to this point is forfeited. " 'A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Holford*, *supra*, 203 Cal.App.4th at p. 169.)

6.      Renumber footnotes accordingly.

        This modification does not change the judgment.  Appellant's petition for rehearing is denied.

FOR THE COURT:


        /s/
HULL, Acting P. J.



        /s/
MURRAY, J.



        /s/
DUARTE, J.

4

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C081843 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F05054 ) |
| v. | |
| RYAN DOUGLAS ROBERTS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Gerrit W. Wood, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Clara M. Levers, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II through VIII.

Thirteen-year-old Jessica F.-H. was brutally murdered in a Sacramento County park. Her murder went unsolved until defendant's DNA was linked to her belt buckle and cigarette butts found at the scene. Defendant's DNA had been collected after an unrelated felony arrest more than a year after Jessica's murder. Although that arrest was supported by probable cause, he was not formally charged in that matter. Based primarily on the DNA evidence, a jury found defendant guilty of murder in the first degree. The jury also found true an enhancement allegation that defendant personally used a deadly and dangerous weapon, a knife. Defendant was sentenced to an aggregate term of 26 years to life.

In this case, we address the issue of whether using a DNA sample taken from a defendant who is validly arrested for a felony on probable cause but never formally charged, violates the defendant's federal or state constitutional rights against unreasonable search and seizure or his state constitutional right to privacy. In the published portion of this opinion, we conclude defendant's federal right protecting him against unreasonable search and seizure was not violated. Like the United State Supreme Court, we see this situation as no different than taking fingerprints and photographs of someone arrested on probable cause. And like fingerprints and photographs, once validly obtained, the later use of that evidence in the investigation of another crime is not constitutionally prohibited. We further hold that defendant's state constitutional rights were not violated, but even if they were, the Truth-in-Evidence provision of Proposition 8 prohibits suppression of the DNA evidence in a criminal trial.

In addition to (1) defendant's search and seizure and privacy claims concerning the DNA evidence, defendant also asserts (2) the trial court prejudicially erred in restricting the scope of his gang expert's testimony; (3) the trial court prejudicially erred in precluding the defense from presenting certain demonstrative evidence; (4) the trial court denied defendant due process by refusing to give his proposed pinpoint jury instruction on third party culpability; (5) the cumulative effect of the trial court's errors

2

warrants reversal; (6) the trial court erred in denying defendant's motion for a new trial premised on newly discovered evidence; and (7) the trial court erred in concluding a juror did not commit prejudicial misconduct related to statements made on Twitter during the trial. As to the last claim, defendant requests that we perform an independent in camera review of the juror's Twitter account records, which we have done.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The People's Case-in-chief

**The Night of the Murder**

Jessica[1] lived with her mother and her maternal grandmother. She attended a school, which was adjacent to Rosemont Community Park (the park) where she was killed.

On Monday, March 5, 2012, Jessica and her mother got into an argument and, at approximately 5:45 or 6:00 p.m., Jessica left the apartment. She took a pack of Camel cigarettes with her. Later, at 6:29 p.m., Jessica is seen in a surveillance video, walking near the west side of the park, smoking a cigarette.

At approximately 6:00 p.m., a little league team finished practice at the park and the coach locked the dugouts by placing a chain and lock on the dugout entrances. He did not remember seeing anyone else at the park when he left other than his assistant coach and that coach's son.

On that same evening, defendant met up at the park with his friend, J.M. and J.M.'s son and daughter, eleven-year-old M.K. and nine-year-old M.A. According to

---

[1] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to the victim initially as Jessica F.-H. and thereafter as Jessica. We use the same convention in referring to certain witnesses, referring to them initially by first name and last initial, and thereafter by first name only. We refer to certain other witnesses by their initials.

3

M.K., defendant arrived at the park on his skateboard.[2] While at the park, J.M. and defendant smoked cigarettes defendant furnished, Marlboro Smooth menthols.

J.M., M.K. and M.A. all remembered seeing Jessica, whom they did not know, in the park. J.M. first observed Jessica sitting alone at a picnic table smoking. He then saw her go to the swings. M.K. and M.A. saw Jessica on the swings, alone, smoking a cigarette. M.A. remembered defendant sitting on a swing talking to Jessica for approximately 10 minutes. J.M. testified that, at one point, he asked Jessica what she was doing there, because it was getting late. According to J.M., Jessica responded that she did not feel like going home yet.

Before leaving the park, J.M. asked Jessica if she was sure she was okay and/or encouraged her to go home because it was getting late. Jessica responded that she would be fine and that she just had an argument with her mother and was not ready to go home yet. J.M. told Jessica to be safe and he and his kids left. According to M.A., they left at 7:00 or 8:00 p.m.; according to J.M., they left when it was getting dark. Defendant left at the same time, but by a different route. Jessica remained on the swings, alone.

During the evening, a nearby resident was outside of her house when she heard the sound of a girl screaming in the park. She characterized the scream as different from the sounds she would typically hear coming from the park, because it "was just a lone scream" rather than screaming accompanied by laughter or other screams. After the scream, she heard what sounded like two male voices coming from the area of the baseball diamond. The resident testified that three or four minutes later, she heard "a car take off from the park . . . just screaming down the street really, really fast." When asked

---

[2] M.A. was not sure whether defendant had his skateboard or his motorcycle. J.M. testified defendant walked to the park that night, and further testified he did not have his skateboard with him.

if she recalled telling officers that she heard the scream between 8:00 and 9:00 p.m., she responded, "[t]hat sounds right."

Another resident testified that, between 8:30 and 9:00 p.m., she heard "a bad scream" that "sounded really bad, like from a horror movie." The scream came from an area of the park near a baseball diamond. She had heard screams coming from the park before, "but not like that."

**The Discovery of Jessica and the Cigarette Butts**

On the following morning, Tuesday, March 6, 2012, a woman went to the park to collect bottles and cans. She looked into a dugout at one of the baseball fields and saw what she initially thought to be a person sleeping. After taking another look, she realized "the person didn't look like they were alive" because the person "was kind of blue." She called 911.

Kenneth Clark, a Sheriff's detective who responded to the scene, observed Jessica's lifeless body in the dugout. Clark observed a number of Camel cigarette butts on the ground in the area of the dugout, which were consistent with a Camel cigarette package he observed near Jessica.

**Defendant's Discussions with Others After the Murder**

The day after they were in the park with defendant and saw Jessica, M.K. heard J.M. talking on the phone to defendant. J.M. said to defendant, "That girl from last night, she is on the news." Defendant came over later in the day.

While at J.M.'s residence, J.M. and defendant watched a news story reporting the discovery of Jessica's body in the park. J.M. was shocked and found himself wishing he had done more to encourage her to leave. He testified defendant was just as shocked. But defendant did not mention returning to the park or that he went to the dugout area that night.

Salvador C. was also friends with defendant. Salvador heard a news report about a girl's body having been found in the park. He called J.M. and told him about the report.

5

J.M. and defendant later went to Salvador's apartment. Both J.M. and defendant indicated they had been at the park the prior night with J.M.'s kids and that they had met Jessica. They both discussed the substance of the brief exchanges they had with her. Both J.M. and defendant said they then left the park and went to their respective homes. Defendant did not mention that he had gone back to the park after initially leaving, that he met up with Jessica, or that he smoked or shared cigarettes with her. Nor did defendant mention he had been in the baseball area of the park that night.

**Defendant and His Knives**

M.K. and M.A. both testified they had previously seen defendant in possession of a knife. M.K. testified that defendant actually showed J.M. a folding knife while they were at the park that evening. M.K. also saw defendant with a folding knife two days after the killing. J.M. testified that defendant owned a tactical folding knife that he would sometimes have with him, but that defendant did not have the knife with him on the evening when they saw Jessica.

Salvador had previously seen defendant in possession of knives. He knew defendant to have three or four knives. Any time defendant got a new knife, he would show it to Salvador. At times, defendant would have his knives on his person. According to Salvador, most of the knives defendant had were folding knives. One was a folding tactical knife like "the military might use." Salvador testified that defendant would have a knife clipped onto his pants "maybe every other time I seen him."

**The Forensic Pathology Evidence**

Dr. Gregory Reiber, an expert in forensic pathology, performed the autopsy on Jessica. She was four feet ten inches tall and weighed 87 pounds.

Reiber testified Jessica sustained two stab wounds, one to the right front side of her neck and the other on the right side back of the neck. The wound on the front right side was slightly more than an inch long on the surface of the skin, slightly less than one quarter of an inch wide, and it penetrated just more than two and a half inches deep. It

6

penetrated muscle tissue and Jessica's carotid artery, cutting "almost all the way through." Reiber described this wound as typical of one inflicted by a single-edged knife. The knife wound to the back of the neck was a "small stab wound" that penetrated "almost an inch deep." It did not do any significant internal damage.

Jessica also sustained a skull fracture on the left rear side of her head. Reiber opined that this wound was the result of "a very forceful impact." It was "the kind of fracture that you can sometimes see in a full-standing-height fall backwards in an adult who passes out and doesn't do anything to interrupt their fall" onto a hard surface. Reiber had been to the crime scene and opined that Jessica's head injury was consistent with a fall or drop onto the cement surface of the dugout floor.

Reiber also found evidence of asphyxia by chest compression. There were petechial hemorrhages on Jessica's face, in her scalp, and in her eyelids. Her face also showed hypercongestion, meaning that it was very flushed. But there was no evidence of external neck compression such as bruising, ligature marks, or other compression marks, leading Reiber to conclude that the asphyxia resulted from a heavy weight being on Jessica's chest. He opined that these findings were consistent with a large enough person sitting or kneeling on Jessica's chest, placing a great deal of weight on her chest.

Jessica also sustained bruises on the right side of her lower face by her jaw and chin and abrasions on her neck and hands. Of the bruises on the right side of her lower face near her jaw, Reiber testified that they were close to the large stab wound, and that "it's possible that there could be a connection if her head was forcefully held back with some fingers for a knife to reach this part of the skin. That might be an explanation for these bruises in this location." Additionally, Jessica had bruises on her upper back in the area of her shoulder blades.

Reiber concluded that the cause of Jessica's death was a combination of blunt force head injury, asphyxia by chest compression, and a stab wound to the neck. According to Reiber, the large stab wound to the neck would have been fatal by itself.

Additionally, the asphyxia by chest compression could have been fatal by itself, depending on how long it lasted.  Reiber opined the blunt force injury to Jessica's head could have been survivable with medical intervention.  However, in combination with the other injuries, it would have been a significant contributor to her death.

Reiber found no identifiable sperm on any samples taken from Jessica.  He also found no evidence of injury to Jessica's vaginal or anal areas.  Based on toxicology testing, there was no evidence of alcohol or drugs in Jessica's body.

### The DNA Evidence – Camel Cigarette Butts and Jessica's Belt Buckle

Jessica spent the weekend prior to her murder at her father's house.  He was a smoker and smoked Camels.  While he did not know whether Jessica took any of his cigarettes when he returned Jessica to her mother's house on Sunday afternoon, he had caught her taking cigarettes from him before.  As noted, Detective Clark observed a number of Camel cigarette butts on the ground in the area of the dugout which were consistent with pack of Camel cigarettes near Jessica.

Megan Wood, a criminalist at the Sacramento County District Attorney's Laboratory of Forensic Services, testified as an expert in DNA analysis.  She performed DNA analysis on cigarette butts collected from the dugout area.  One cigarette butt contained DNA consistent with Jessica's DNA, but inconsistent with defendant's DNA.  Two cigarette butts (TM-6 & TM-19) contained DNA consistent with defendant's DNA, but inconsistent with Jessica's.  Wood testified that the likelihood of selecting an individual at random from the Caucasian population whose DNA matched the DNA profile found on TM-19 was one in 28 quintillion.  One cigarette butt (TM-3) contained a mixture of DNA, with Jessica's DNA being consistent with the major contributor and defendant's DNA being consistent with the minor contributor.  The chance that an individual selected at random from the Caucasian population would have a DNA profile consistent with the minor contributor was one in two billion.  Another cigarette butt (TM-21) also contained a mixture of DNA, with Jessica's DNA being consistent with the

major contributor and defendant's DNA being consistent with the minor contributor. The chance that an individual selected at random from the Caucasian population would have a DNA profile consistent with the minor contributor was one in one billion. Another cigarette butt (TM-4) also contained a mixture of DNA, with Jessica and defendant both being possible donors. Wood testified that the probability of selecting an individual at random from the Caucasian population who would be included as a possible contributor to the mixture would be one in 32 million. Another cigarette butt (TM-2) contained a mixture from what Wood believed to be two contributors. Again, Jessica and defendant were potential contributors to the mixture. The probability of selecting an individual at random from the Caucasian population who would be included as a potential contributor was one in 200 million according to Wood. Another cigarette butt (TM-1) contained DNA consistent with Jessica as the major contributor, and, based on a partial profile, defendant could not be excluded as the minor contributor. The probability of selecting an individual at random from the Caucasian population who could potentially be the minor contributor was one in 13,000. As for the final cigarette butt (TM-7), Wood testified that Jessica's DNA profile was consistent with that of the major contributor, and, while defendant's DNA profile could not be excluded as the minor contributor, the probability of selecting an individual at random from the Caucasian population who could potentially be the minor contributor was one in two.

In addition to the cigarette butts, Wood performed DNA analysis on Jessica's belt, including the buckle. Wood found a mixture of DNA on the buckle. The major contributor profile was consistent with Jessica's DNA profile. Defendant's DNA profile was consistent with the minor contributor's profile, based on the six alleles Wood found. The likelihood of selecting an individual at random from the Caucasian population whose DNA profile would match the minor contributor's profile was one in 550.

Wood also examined the oral, vaginal and rectal swabs from the autopsy and found no spermatozoa.

**Defendant's Arrest, Statements to Law Enforcement and Recorded Jail Phone Call**

On the evening of August 7, 2013, almost a year and a half after Jessica was murdered, Detective Clark and Detective Tony Turnbull contacted defendant outside of a restaurant and interviewed him. Unbeknown to defendant, his DNA had been matched in the Combined DNA Index System (CODIS) to items at the crime scene. In the interview, Clark asked defendant if he recalled a murder of a young girl that took place in the park a year and a half earlier. Defendant said he did. He stated "my buddy took his kids up to the park around there. And he was telling me the next day that some kid he saw got murdered." Later in the interview, defendant told the detectives that J.M. told him "a little girl got killed. And he was up there . . . the day before with his, uh, with his kids." Detective Clark showed defendant a photograph of Jessica and asked defendant if he had ever seen her before. Defendant responded that he had not. Defendant denied ever having been in the dugout. He also denied being in the park at any point on that Monday or Tuesday. When Clark asked defendant whether there was any reason evidence from the crime scene would match defendant, defendant responded that there was not. When asked if there was any reason to believe DNA or fingerprint evidence would match defendant, he responded, "No, sir." Defendant again denied having any contact with Jessica.

At the conclusion of the interview, defendant told the detectives, "you have my phone number if you need me. And, like, uh, I wanna get cleared out of this. Um, I'd offer DNA and fingerprints but, honestly, I'm already in the system. So you guys can run me."

After their discussion, the detectives decided that they were going to have defendant arrested. Other deputies arrested defendant and brought him to the homicide

10

bureau where Clark and Turnbull again interviewed him.[3]  The interview was recorded, and the video recording was played for the jury.

As the interview commenced, Clark told defendant that some of what he had told them did not add up and further told defendant that he was under arrest for murder. Defendant responded, "okay."  Clark informed defendant of his *Miranda*[4] rights.

Clark asked defendant if he was sure he had never been in the dugout at the park before, and defendant responded that he was sure.  Clark informed defendant that there had been a DNA match made between evidence at the crime scene and defendant's DNA profile.  When defendant asked what items were found to have his DNA on them, Clark informed defendant that they had discovered cigarette butts in the dugout that belonged to Jessica.  Clark stated that several of the cigarette butts had both defendant's and Jessica's DNA on them.  Defendant asked, "Cigarette butts?"  Clark responded affirmatively, and defendant replied, "That's what has me here?"  Clark asked defendant if he had smoked cigarettes with Jessica, and defendant responded he had not, but that he did smoke cigarettes.  Clark explained he thought defendant was responsible for Jessica's death, adding he would not be arresting him otherwise.  He then told defendant that he understood that sometimes things "go[] wrong" and "happen[] rapidly."  Clark continued, "But you both were there - the evidence shows that.  You both had a conversation that went on for some period of time that was normal and then she is no longer with us.  And so I'd like to know what happened."  Clark asked defendant if Jessica attacked him or if he had to defend himself.  He again asked what went wrong, and how Jessica and defendant went from smoking cigarettes together to Jessica being dead.  Defendant responded:  "That's reading a lot into cigarette butts."  Clark responded that, from the

---

[3]  Both interviews were recorded, and the video recording was played for the jury.

[4]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].  Defendant does not challenge the admissibility of the statements he made during either interview.

evidence, he knew Jessica brought the cigarettes to the park, he knew defendant and Jessica shared a number of them, and that defendant's and Jessica's DNA were both on five or six cigarette butts. Clark stated, he had to wonder why defendant was denying that he ever met Jessica and that he had ever been in the dugout. He again asked what went wrong and "why . . . did this occur?" Defendant responded only: "Damn I like both you guys and I wish we weren't on opposite sides."

After a break in the recording, Clark can be seen writing while defendant, with his chin on his hands resting on a table, says, unprompted, "this is my lesson to quit smoking cigarettes." Defendant subsequently professed his innocence. He said he was aware the detectives could lie to him and expressed skepticism about why, if his DNA matched evidence at the crime scene, it took detectives a year and a half to speak with him. Defendant also stated he had been "known to smoke refi's," or cigarettes that had previously been smoked and discarded. Subsequently, alone in the interview room, defendant laughed to himself and stated: "Once this shit is over with, never smoking cigarettes again."

Defendant was transferred to the Sacramento County main jail. In a recorded phone conversation between defendant and an unidentified male, defendant said he was "not worried about it." Defendant said the "only thing they have is old freakin' cigarette butts, I guess, at the scene." He continued: "they got some cigarette butts at the scene that have my DNA on them and they said they have hers. So either this bitch smoked after I left my cigarette butts or honestly I smoked after she left mine. [*sic*] Whatever. It's been a year and a half . . . . They're grasping for straws right now. I could tell in the interrogation room. They are grasping for straws. This is my [¶] . . . [¶] - sign to quit smoking."

Both J.M. and Salvador testified they had never seen defendant pick up and smoke discarded cigarettes.

**The Defense**

Defendant mounted a third party culpability defense, asserting that the responsible persons were another young girl, S.L., and/or S.L.'s adult acquaintance, Christopher R. Jessica and S.L. had gone to the same school adjacent to the park and had been friends. S.L. was a member of the Juggalos, a criminal street gang, and, according to S.L., Jessica was scheduled to be initiated into the gang the weekend immediately preceding her death. We set forth *post* in the unpublished parts of this opinion additional background related to defendant's evidence and other issues he raises.

**Verdict and Sentence**

The jury found defendant guilty of murder in the first degree (Pen. Code, §§ 187, subd. (a), 189),[5] and found true the enhancement allegation that defendant personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)). The trial court sentenced defendant to 25 years to life on count one, plus an additional term of one year for the weapon enhancement.

**DISCUSSION**

**I. Collection and Analysis of Defendant's DNA from Subsequent Felony Arrest**

**A. Additional Background**

Prior to trial, defendant moved under section 1538.5 to suppress the DNA evidence. He asserted that California's practice of collecting and analyzing DNA from felony arrestees, including those who are ultimately not formally charged or convicted, violates the arrestees' search and seizure rights under the Fourth Amendment to the United States Constitution and article I, section 13, of the California Constitution, and the arrestees' privacy rights und article I, section 1 of the California Constitution. Defendant attempted to distinguish the Maryland DNA collection law approved by the United States

---

[5] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

13

Supreme Court in *Maryland v. King* (2013) 569 U.S. 435 [186 L.Ed.2d 1] (*King*) from California's law. He pointed out that the Maryland statute authorizes collection and processing of DNA from a narrower class of arrestees, requires a judicial determination of probable cause before the sample is analyzed and placed in the DNA database, and provides for automatic expungement of DNA samples when the charges are judicially determined to be unsupported by probable cause or do not result in a conviction. California's scheme does not have any of those requirements. Because of the differences between the California and Maryland statutes, defendant asserted California's statutory scheme should not be upheld based on *King*. Defendant asserted that, because all felony arrestees must have DNA samples taken and analyzed, regardless of whether they are ever formally charged or convicted, the California statutory scheme grants law enforcement essentially unfettered discretion to take DNA samples.

In opposition, the prosecution argued that the United States Supreme Court's holding in *King* was unambiguous and noted defendant never mentioned the holding in his briefing on the motion. As the prosecution pointed out, the *King* court held: "the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. *When officers make an arrest supported by probable cause* to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*King, supra*, 569 U.S. at pp. 465-466, italics added.) The prosecution asserted that the *King* holding applied, and citing *Haskell v. Harris* (9th Cir. 2014) 745 F.3d 1269 (*Haskell I*), noted that the Ninth Circuit, in holding that the California statute was not unconstitutional, had rejected similar arguments

14

attempting to distinguish *King* based on the differences between the Maryland and California statutes.**6**

In a tentative ruling, the trial court denied defendant's motion, ruling that *King* applied. The court also found *Haskell I, supra,* 745 F.3d 1269, to be persuasive. Following oral argument, the trial court adopted its tentative ruling.

Thereafter, the parties agreed to the following stipulation:

"1. [Defendant's] DNA was taken by way of buccal swab on or about June 1, 2013 following a May 30, 2013, *lawful arrest* for a felony, *based upon the officer's finding probable cause*.[7]

"2. On June 3, 2013, the Sacramento County District Attorney's office reviewed the reports relating to [defendant's] arrest and declined to file any charges, felony or misdemeanor, against [defendant] citing a lack of sufficient evidence.

"3. [Defendant] was released from custody at the Sacramento County Jail on June 4, 2014.

"4. Owing to the lack of charges being filed against [defendant] regarding the May 30, 2013, arrest, [defendant] never appeared before a magistrate for arraignment on those allegations.[8]

---

**6** The prosecution further asserted that, even if the taking of the DNA sample from defendant violated his Fourth Amendment rights, suppression was not appropriate based on the good faith exception to the exclusionary rule, citing *Illinois v. Krull* (1987) 480 U.S. 340, 347-350 [94 L.Ed.2d 364].

**7** According the parties' pleadings related to defendant's suppression motion, he had been arrested on May 30, 2013, for violations of section 273.5, spousal abuse, and section 262, spousal rape.

**8** We take judicial notice of the calendar for the year 2013. (Evid. Code, §§ 452, subd. (h), 459 subd. (a)(2); *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936.) May 30, 2013 was a Thursday. Defendant was booked into the jail during the early morning hours of Friday, May 31, 2013. June 3, 2013, the day the district attorney declined to file charges,

15

"5. [Defendant] has never subsequently been arrested or charged as a result of the events of May 30, 2013.

"6. After the Sacramento County District Attorney's Office declined to file charges relating to the May 30, 2013, arrest and [defendant] was released from custody, [defendant's] DNA sample was received by, and tested by, the California Department of Justice (DOJ)[.]

"7. [Defendant's] DNA profile, once uploaded into CODIS, remained in that system and was compared to evidence items an indeterminate number of times.

"8. [Defendant's] profile was 'matched' to items of evidence containing unknown DNA samples in Sacramento Sheriff's Department case number 12-48769 relating to the death of [Jessica] by the Department of Justice, Jan Bashinski Laboratory (DOJ). This 'match' occurred on or about August 5, 2013.

"9. As a result of the 'match' referenced in number ten (10) [*sic*], the DOJ notified the Sacramento County District Attorney's Crime Lab, who in turn notified the Sacramento County Sheriff's Department of the 'match,' the items of evidence to which

_____

was a Monday and defendant was released on Tuesday, June 4, 2013. The record is silent on whether there was a probable cause determination made by an on-call judicial officer during the weekend, although ordinarily this would have been the case. (See *People v. Buza* (2018) 4 Cal.5th 658, 677 (*Buza*) ["When officers make a warrantless arrest and take a suspect into custody, due process ordinarily requires that a judicial officer make a probable cause determination promptly after booking -- ordinarily within 48 hours -- to justify continued pretrial detention"]; see also *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56-59 [114 L.Ed.2d 49] ["a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein* [*v. Pugh* (1975) 420 U.S. 103 [43 L.Ed.2d 54]]"; if arrestee does not receive a probable cause determination within 48 hours, the state must demonstrate "the existence of a bona fide emergency or other extraordinary circumstance" and a weekend is not such a circumstance]; *In re Walters* (1975) 15 Cal.3d 738, 743; § 810, subd. (a) [requirement that there be at least one judge available on-call as a magistrate at all times when court is not in session in the county].)

16

[defendant's] DNA 'matched,' and the identity of [defendant] as the person to whom the 'match' was made.

"10. As a direct result of the DOJ match, [defendant] was interviewed at night in a parking lot on August 7, 2013, and thereafter arrested for violation of . . . section 187 in the death of [Jessica].

[¶] . . . [¶][9]

"12. Prior to June 1, 2013, [defendant's] DNA profile was unknown, and unknowable, to law enforcement." (Italics added.)

## B. Defendant's Contentions

Defendant asserts the collection of his DNA sample in connection with his May 2013, felony arrest, for which no formal charges were ultimately filed, and the later analysis used to identify and convict him in this case violated his right against unreasonable searches and seizure under the Fourth Amendment to the United States Constitution. Defendant asserts that his privacy interests outweigh the government's interest in seizing DNA from his body without a warrant supported by probable cause based only on his status as a felony arrestee. He further asserts that the United States Supreme Court's holding in *King* should not apply here because *King* addressed a different DNA collection law which was more narrowly tailored and provided greater protection for privacy interests than California's DNA law. According to defendant, in the absence of formal charges or a judicial probable cause determination following his felony arrest, the collection, analysis, and use of his DNA under California's statutory scheme was constitutionally unreasonable in violation of the Fourth Amendment.

While defendant's appeal was pending, our high court decided *Buza, supra*, 4 Cal.5th 658, addressing California's DNA collection law, section 296. We requested

---

**9** Item No. 11 was crossed out.

17

supplemental briefing from the parties on the impact of *Buza* on this case. In his supplemental brief, defendant asserts that *Buza* left unanswered the question of whether California's DNA law violates the Fourth Amendment rights of an arrestee who is ultimately not charged in connection with the felony arrest for which DNA was collected and later used to identify him as the perpetrator in an unrelated case. He asserts that *Buza* was narrowly decided, is distinguishable on its facts from this case, and has limited application here. He argues he is of a different class of arrestee than the defendants in *King* and *Buza* because, unlike either of those defendants, he was neither formally charged nor convicted in connection with his felony arrest which led to the collection of his DNA sample. According to defendant, the facts of this case meaningfully alter the constitutional balance the United States Supreme Court struck in *King*.

Separate from the federal constitutional search and seizure provision, defendant argues the collection and analysis of his DNA under the facts here violated our state's prohibition against unreasonable seizures and searches in California Constitution, article I, section 13. He maintains the *Buza* court's rationale for declining to exercise independent state judgment by relying primarily on *King* is not relevant to the facts here because he was never formally charged with a crime in connection with his May 2013 felony arrest. He asserts that without an automatic expungement of DNA for people like him who are not formally charged, the DNA Act violates California's unreasonable seizures and searches provision in article I, section 13.

Defendant further asserts that the collection and use of his DNA violated California's right to privacy in article I, section 1 of the California Constitution.

We reject all of defendant's claims and conclude that the collection and use of his DNA to identify him as the perpetrator of Jessica's murder did not violate his federal constitutional rights. Nor did it violate his state constitutional rights, and even if it did, suppression of the DNA evidence is not an available remedy because of the Truth-in-Evidence provision of Proposition 8.

18

## C. General Search and Seizure and Exclusionary Rule Principles

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment is binding on the States pursuant to the Fourteenth Amendment. (*King, supra*, 569 U.S. at p. 446.) "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" within the scope of the Fourth Amendment. (*Ibid.*)

Article I, section 13 of the California Constitution provides, in language similar to the Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

The " 'touchstone for all issues' " under both the Fourth Amendment and article I, section 13, of the California Constitution is " 'reasonableness.' " (*Buza, supra*, 4 Cal.5th at p. 670, citing *Riley v. California* (2014) 573 U.S. 373 [189 L.Ed.2d 430] & *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1329; accord, *King, supra*, 569 U.S. at p. 447.) "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (*Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297].)

Thus, "[e]ven [when] a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution. . . . To say that no warrant is required is merely to acknowledge that 'rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.' This application of 'traditional standards of reasonableness' requires a court to weigh 'the promotion of

19

legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.' " (*King, supra*, 569 U.S. at p. 448.)

Regarding the exclusionary rule remedy for a search and seizure violation, California Constitution, article I, section 28, subdivision (f)(2), the Truth-in-Evidence provision enacted by voters in Proposition 8 in 1982,[10] abolished the exclusionary rule as to "evidence seized in violation of the California, but not the federal, Constitution." (*In re Lance W.* (1985) 37 Cal.3d 873, 879 (*Lance W.*) [discussing the same provision previously located in Cal. Const., art. I, § 28, subd. (d), before it was renumbered by Prop. 9, § 4.1, in 2008].) Thus, "[a]bsent a federal constitutional violation, the exclusionary rule does not apply." (*People v. Redd* (2010) 48 Cal.4th 691, 720, fn. 11 (*Redd*); accord, *Buza, supra*, 4 Cal.5th at p. 685 ["in California criminal proceedings, issues related to the suppression of evidence seized by police are, in effect, governed by federal constitutional standards"]; *People v. Robinson* (2010) 47 Cal.4th 1104, 1119 (*Robinson*) [a trial court may exclude evidence only if exclusion is mandated by the federal Constitution]; *People v. Banks* (1993) 6 Cal.4th 926, 934 (*Banks*) [same].) "Our Constitution thus prohibits employing an exclusionary rule that is more expansive than that articulated by the United States Supreme Court." (*Robinson*, at p. 1119.)

---

[10] California Constitution, article I, section 28, subdivision (f)(2), states: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

## D. *King*

In *King*, the United States Supreme Court expressly held: "*When officers make an arrest supported by probable cause* to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*King*, *supra*, 569 U.S. at pp. 465-466, italics added.) In stating this holding, the high court was fully aware that twenty-eight states, including California, had adopted DNA collection and analysis laws similar to the Maryland law it addressed, but which varied in their particulars. (*Id*. at p. 445, citing the amici curiae brief filed by the State of California et al.) The high court recognized that "although those statutes vary in their particulars, . . . their similarity means that [King's case] implicates more than the specific Maryland law." (*Ibid*.)

The defendant in *King*, was arrested for felony assault related to menacing a group of people with a shotgun. A buccal swab of his cheek was taken as part of the booking process. (*King*, *supra*, 569 U.S. at p. 440.) Thereafter, his DNA profile was found to match DNA collected from a rape committed several years earlier and he was subsequently prosecuted and convicted of that crime. (*Ibid*.)

The Maryland law at issue in *King* authorized the collection of DNA samples from individuals charged with " 'a crime of violence or an attempt to commit a crime of violence' " as defined under Maryland law, or burglary or attempted burglary. (*King, supra*, 569 U.S. at p. 443, quoting Md. Pub. Saf. Code Ann., § 2-504, subd. (a)(3)(i).) Under the Maryland law, the DNA could not be placed into a database until the arrestee was arraigned, at which point there was a judicial determination of probable cause. (*King*, at p. 443.) If a judge determined that probable cause was lacking, the statute required that the sample be immediately destroyed. (*Id*. at pp. 443-444.) Likewise, if there was no conviction or the conviction was reversed, automatic destruction of the sample was required. (*Id*. at p. 444.)

21

However, in considering the reasonableness of the DNA collection procedure and articulating its holding, the Supreme Court in *King* did not focus on the Maryland statute's requirement for a later judicial determination of probable cause or whether there was an eventual conviction. Instead, it focused on the fact that, under the Maryland law, the arrest itself must be supported by probable cause. (*King, supra*, 569 U.S. at p. 448.) As to this, the court noted that, under the law, "all arrestees charged with serious crimes must furnish the sample on a buccal swab . . . to the inside of the cheeks. *The arrestee is already in valid police custody for a serious offense supported by probable cause*." (*Ibid*., italics added.) The *King* court then held: "the search effected by the buccal swab . . . falls within the category of cases this Court has analyzed by reference to the proposition that the 'touchstone of the Fourth Amendment is reasonableness, *not individualized suspicion*.' " (*Ibid*., italics added.)

The high court went on to balance the state interests against the defendant's privacy-related interests to determine whether the collection of the DNA was reasonable. (*King, supra*, 569 U.S. at p. 448.) The court identified five interrelated governmental interests (*id*. at pp. 449-455) and held that "[*w*]*hen probable cause exists* to remove an individual from the normal channels of society and hold him in legal custody, DNA identification plays a critical role in serving these interests" (*id*. at p. 450, italics added). As we emphasize *post*, these interests exist at the time a person is arrested based on probable cause and processed through the booking procedure. Nothing in *King* suggests the applicability of those interests is to be reevaluated as the arrestee's case proceeds through the criminal justice process.

Regarding the specific pertinent governmental interests, the court in *King* began with what it described as the "well established" need for law enforcement officers to process and identify the persons they must take into custody. (*King, supra*, 569 U.S. at p. 449.) "It is beyond dispute that '*probable cause provides legal justification for arresting* a person suspected of crime, and for a brief period of detention to take the

22

administrative steps incident to arrest.' " (*Ibid*., italics added.)  The court reasoned that, because false identifying information can be provided by arrestees in that process, the identification interest goes beyond name or Social Security number.  (*Ibid.*)  Indeed, the concept of "[i]dentity has never been considered limited to the name on the arrestee's birth certificate." (*Ibid*.)

The high court held that the identification interest extends to determining the person's criminal history.  As the high court noted, "[a] suspect's criminal history is a critical part of his identity that officers should know when processing him for detention."[11] (*King*, *supra*, 569 U.S. at p. 450.)  The court then noted that law enforcement already "use[s] routine and accepted means as varied as comparing the suspect's booking photograph to sketch artists' depictions of persons of interest, showing his mugshot to potential witnesses, and of course making a computerized comparison of the arrestee's fingerprints against electronic databases of known criminals *and unsolved crimes*." (*Id*. at p. 451, italics added.)  The court further explained:  "[a] DNA profile is useful to the police because it gives them a form of identification to search the records already in their valid possession.  In this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene.  DNA is another metric of identification used to connect the arrestee with his or her public persona, as reflected in records of his or her actions that are available to the police. . . . These data, found in official records, are checked as a routine matter to produce a more

---

[11]  As to this, the court in *King* noted that people detained for minor offenses sometimes "turn out to be the most devious and dangerous criminals." (*King, supra*, 569 U.S. at p. 450.)  As an example, the high court noted that Timothy McVeigh was arrested after he was stopped for driving without a license plate. (*Ibid*.)

23

comprehensive record of the suspect's complete identity. *Finding occurrences of the arrestee's CODIS profile in outstanding cases is consistent with this common practice. It uses a different form of identification than a name or fingerprint, but its function is the same.*" (*Id*. at pp. 451-452, italics added.) The high court further reasoned that, although DNA is an "analogue" to "the familiar practice of fingerprinting arrestees," DNA identification is qualitatively better because DNA analysis provides "unparalleled accuracy." (*Id*. at pp. 451, 458.)

The court in *King* rejected the defendant's argument that the delay in obtaining DNA results makes the analogy to fingerprint identification inapt. (*King, supra*, 569 U.S. at p. 459.) It noted that rapid analysis of fingerprints is of relatively recent vintage and it was not the advent of fingerprint identification technology "that rendered fingerprint analysis constitutional in a single moment. The question of how long it takes to process identifying information obtained from a valid search goes only to the efficacy of the search for its purpose of prompt identification, not the constitutionality of the search." (*Ibid*.) DNA, the court declared, "serves an essential purpose despite the existence of delays." (*Id*. at p. 460.) Looking to the future, the *King* court recognized that rapid technical advances are reducing the delay in processing DNA. (*Ibid*.) The court stated: "[a]n assessment and understanding of the reasonableness of this minimally invasive search of a person detained for a serious crime should take account of these technical advances. Just as fingerprinting was constitutional for generations prior to the introduction of [automated fingerprint identification], DNA identification of arrestees is a permissible tool of law enforcement today. New technology will only further improve its speed and therefore its effectiveness." (*Ibid*.)

Summarizing the identification interest, the court in *King* wrote: "there can be little reason to question 'the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in ensuring his identification in the event he flees prosecution.'

24

[Citation]. To that end, courts have confirmed that the Fourth Amendment allows police to take certain routine 'administrative steps incident to arrest—i.e., . . . book[ing], photograph[ing], and fingerprint[ing].' [Citation]. *DNA identification of arrestees*, of the type approved by the Maryland statute here at issue, *is 'no more than an extension of methods of identification long used in dealing with persons under arrest.' [Citation]. In the balance of reasonableness required by the Fourth Amendment, therefore, the Court must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest.*" (*King, supra*, 569 U.S. at p. 461, italics added.)

As to the second interest, one involving risk assessment, the *King* court noted that law enforcement officers must ensure that the custody of an arrestee does not create a risk to staff, the detainee population, or the arrestee; thus "officers must know the type of person whom they are detaining, and DNA allows them to make critical choices about how to proceed." (*King, supra*, 569 U.S. at p. 452.) For example, knowledge of identity may provide information indicating the arrestee "is *wanted for another offense*, or has a record of violence or mental disorder." (*Ibid.,* italics added.) In noting that DNA evidence may establish whether an arrestee is wanted for another offense, the court did not distinguish between other offenses for which the arrestee had been previously identified as the perpetrator and those where a DNA match identified him as the perpetrator of a previously unsolved crime. The reasoning appears to apply to both situations.

Third, the court in *King* noted that there is a governmental interest in ensuring that persons accused of crimes are available for trials. (*King, supra*, 569 U.S. at p. 453.) As the court observed, "[a] person who is arrested for one offense but knows that he has yet to answer for some past crime may be more inclined to flee the instant charges, lest continued contact with the criminal justice system expose one or more other serious offenses." (*Ibid*.)

25

Fourth, there is a public danger assessment interest. The high court reasoned that "an arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the individual should be released on bail." (*King, supra*, 569 U.S. at p. 453.) This interest, the court noted, "is both legitimate and compelling.' " (*Ibid.*) "Knowing that the defendant is wanted for a previous violent crime based on DNA identification is especially probative of the court's consideration of 'the danger of the defendant to the alleged victim, another person, or the community.' " (*Ibid.*) Further, if the arrestee is released pending trial, later DNA identification revealing a previously unknown violent past "can and should" lead to revocation of the arrestee's release. (*Id.* at p. 455.) Again, like the last two interests, this interest applies even in the situation where the arrestee had not been previously identified as the perpetrator of the prior crime.

Fifth, there is an interest related to the exoneration of innocent persons. "[I]n the interests of justice, the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense. '[P]rompt [DNA] testing . . . would speed up apprehension of criminals before they commit additional crimes, and prevent the grotesque detention of . . . innocent people.' " (*King, supra*, 569 U.S. at p. 455.)

After discussing the governmental interests, the Supreme Court next looked to the arrestee's privacy interest. "[T]he fact that [an] intrusion is negligible is of central relevance to determining whether the search is reasonable." (*King, supra*, 569 U.S. at p. 446.) Regarding the physical intrusion associated with the collection of a buccal sample, the court characterized the intrusion as "a minimal one." (*Id.* at p. 461.) The search involves " '[a] gentle rub along the inside of the cheek [that] does not break the skin, and it 'involves virtually no risk, trauma, or pain.' " (*Id.* at pp. 463-464.) The swab poses no physical danger and "does not increase the indignity already attendant to normal incidents of arrest." (*Id.* at p. 464.) Comparatively, any additional intrusion in collecting

a DNA sample by buccal swab beyond the intrusion involved with fingerprinting is "not significant." (*Id*. at p. 459.)

Noting that a finding of reasonableness requires that the government interest outweigh the degree to which the search invades an individual's legitimate expectations of privacy, the court noted, "the necessary predicate of a valid arrest for a serious offense is fundamental." (*King, supra*, 569 U.S. at p. 461.)  Persons arrested on probable cause have diminished expectations of privacy. (*Id*. at pp. 461, 463.)  And "[i]n light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks." (*Id*. at p. 465.)  The court did not mention later events such as the filing of formal charges, a judicial probable cause determination, or even a conviction as being necessary events to weigh into the balance.

The *King* court went on to highlight scientific and statutory safeguards protecting an arrestee's privacy interests.  As for scientific safeguards, related to the nature of the DNA processing at issue, the court concluded that the processing employed did not "intrude on [the defendant's] privacy in a way that would make his DNA identification unconstitutional." (*King, supra*, 569 U.S. at p. 464.)  This is because the DNA loci used for identification "come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee." (*Ibid*.)  Commonly referred to as "junk DNA," the DNA region used for identification is useful for that purpose, but "does not show more far-reaching and complex characteristics like genetic traits." (*Id*. at pp. 442-443.)  Moreover, even if the noncoding loci could provide sensitive information, they are not tested toward that end; rather, the analysis generates a unique identifying number against which other samples can be matched for identification comparison and nothing more. (*Id*. at p. 464.)  As for the statutory safeguards, the court noted that Maryland law provided statutory protections that guard against further invasion of privacy by prohibiting and penalizing the improper use of DNA samples. (*Id*. at p. 465.)  In light of the scientific and statutory

27

safeguards, the high court concluded that "once the [arrestee's] DNA was lawfully collected, the . . . analysis of [his] DNA pursuant to CODIS procedures did not amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment." (*Ibid.*)

Summarizing the constitutional balance, the high court in *King* stated: "In light of the context of *a valid arrest supported by probable cause* respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, *that same context of arrest gives rise to significant state interests* in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody." (*King, supra*, 569 U.S. at p. 465, italics added.) The high court then held: "Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. *When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.*" (*Id.* at pp. 465-466, italics added.)

### E. California's DNA Collection Statutory Scheme

"In 2004, California voters passed Proposition 69 (Prop. 69, as approved by voters, Gen. Elec. (Nov. 2, 2004), known as the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (DNA Act)) to expand [then] existing requirements for the collection of DNA identification information for law enforcement purposes. The DNA Act requires law enforcement officials to collect DNA samples, as well as fingerprints, from all persons who are arrested for, as well as those who have been convicted of, felony offenses." (*Buza, supra*, 4 Cal.5th at p. 664, citing § 296.1, subd. (a)(1)(A).) Prior to 2004, the collection of DNA samples was limited to persons convicted of specific

28

felony offenses, "including certain sex offenses, homicide offenses, kidnapping, and felony assault or battery." (*Buza*, at p. 665, citing Stats. 1998, ch. 696, § 2, pp. 4571-4579 & former § 296, subd. (a).) Thus, the electorate's passage of the DNA Act in 2004 "substantially expanded the scope of DNA sampling to include individuals who are arrested for any felony offense." (*Buza*, at p. 665.)

"Proposition 69 declared:  '[t]he state has a compelling interest in the accurate identification of criminal offenders . . .'; that 'DNA testing at the earliest stages of criminal proceedings for felony offenses will help thwart criminal perpetrators from concealing their identities and thus prevent time-consuming and expensive investigations of innocent persons'; and 'it is reasonable to expect qualifying offenders to provide forensic DNA samples for the limited identification purposes set forth in this chapter.' " (*Buza, supra*, 4 Cal.5th at p. 666.)

Under the DNA Act, all adult felony arrestees "shall provide buccal swab samples, right thumbprints, and a full palm print impression of each hand, and any blood specimens or other biological samples required pursuant to this chapter for law enforcement identification analysis." (§ 296, subd. (a).)  The DNA samples are to be collected by law enforcement "immediately following arrest, or during the booking or intake or prison reception center process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody." (§ 296.1, subd. (a)(1)(A).)

"Collected DNA samples are sent to the California Department of Justice's DNA Laboratory for forensic analysis. [Citations.]  The laboratory uses the samples to create a unique DNA identification profile, using genetic loci that are known as 'junk' or 'noncoding' DNA, because the loci have no known association with any genetic trait, disease, or predisposition. [Citation.]  This profile is stored in California's DNA databank.  California's DNA databank is part of the Combined DNA Index System (CODIS), a nationwide database that enables law enforcement to search DNA profiles

29

collected from federal, state, and local collection programs. [Citations.] DNA profiles stored by the DNA Laboratory may be accessed by law enforcement agencies. [Citation.] The DNA Laboratory must 'store, compile, correlate, compare, maintain, and use' DNA profiles for forensic casework, for comparison with samples found at crime scenes, and for identification of missing persons." (*Buza, supra*, 4 Cal.5th at pp. 666-667.)

Section 299 provides a mechanism for expungement of DNA samples. "A person whose DNA profile has been included in the databank pursuant to this chapter shall have his or her DNA specimen and sample destroyed and searchable database profile expunged from the databank program pursuant to the procedures set forth in subdivision (b) if the person has no past or present offense or pending charge which qualifies that person for inclusion within the state's DNA and Forensic Identification Database and Databank Program and there otherwise is no legal basis for retaining the specimen or sample or searchable profile." (§ 299, subd. (a).)

However, expungement is not automatic; the person who seeks expungement must initiate the process by making a request. (§ 299, subd. (c)(1).)[12] An arrestee may request expungement if "no accusatory pleading has been filed within the applicable period allowed by law," if all qualifying charges against the arrestee are dismissed, or if the arrestee is found not guilty or is found factually innocent of all qualifying charges. (§ 299, subd. (b); *Buza, supra*, 4 Cal.5th at p. 667.)

---

[12] Section 299, subdivision (c)(1) provides: "The person requesting the databank entry to be expunged must send a copy of his or her request to the trial court of the county where the arrest occurred, or that entered the conviction or rendered disposition in the case, to the DNA Laboratory of the Department of Justice, and to the prosecuting attorney of the county in which he or she was arrested or, convicted, or adjudicated, with proof of service on all parties. The court has the discretion to grant or deny the request for expungement. The denial of a request for expungement is a nonappealable order and shall not be reviewed by petition for writ."

## F. Decisional Law Concerning California's DNA Act

### 1. *Buza*

In *Buza*, our high court considered the application of the DNA Act to persons who had been validly arrested for a felony offense based on probable cause, but who had not yet been convicted. (*Buza, supra*, 4 Cal.5th at p. 665.) However, *Buza* did not involve evidence suppression. Rather, the issue the court resolved was the constitutional validity of a misdemeanor conviction for refusing to give a buccal sample at booking under section 298.1, subdivision (a). A four-Justice majority in *Buza* concluded: "the requirement is valid under both the federal and state Constitutions." (*Buza*, at p. 665.) However, the *Buza* majority also explicitly stated, "we express no view on the constitutionality of the DNA Act as it applies to other classes of arrestees." (*Ibid.*)

In *Buza*, the police arrested defendant for arson, having probable cause to do so based on their observations. (*Buza, supra*, 4 Cal.5th at p. 667.) At the county jail, during booking, the defendant refused to comply with the DNA collection procedure. (*Id*. at p. 668.) As a result, in addition to the felony arson, the defendant was charged with misdemeanor refusal to provide a DNA specimen. (§ 298.1, subd. (a).) He was later convicted of all charges. (*Buza*, at p. 668.)

Examining *King*, our high court twice acknowledged the high court's holding as the following: "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*Buza, supra*, 4 Cal.5th at pp. 664, 673.) The *Buza* court also noted the high court's holding applied to "both the initial collection of a DNA sample and its subsequent processing pursuant to CODIS procedures." (*Id*. at p. 671.)

Moreover, in its analysis, the *Buza* court acknowledged and relied upon the five governmental interests identified and discussed in *King*. (*Buza, supra*, 4 Cal.5th at

31

pp. 671-672.)  Regarding the significance of the identification interest, the *Buza* court emphasized what the court in *King* recognized—that while "suspects can change their names, assume a false identity using forged documents, change their hair color, have tattoos removed, have plastic surgery, and change their eye color with contact lenses," they cannot change their DNA.  (*Id*. at p. 687.)  Similar to *King*, our high court further observed:  " ' "for purposes of identifying 'a particular person' as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible." ' "  (*Id*. at pp. 687-688.)

Buza asserted that his case was distinguishable from *King* on three grounds:  "(1) the DNA Act applies to a broader category of arrestees than the Maryland law; (2) the DNA Act, unlike the Maryland law, authorizes both collection and testing of DNA samples before an accusatory pleading is filed in court and before a judicial determination has been made that the charges are valid; and (3) the DNA Act, unlike the Maryland law, does not provide for automatic destruction of the DNA sample if the arrestee is cleared of felony charges."  (*Buza, supra*, 4 Cal.5th at p. 674.)

In rejecting the defendant's first point—regarding the fact that the Maryland law applies to a narrower class of arrestees—the *Buza* court noted that the DNA Act authorizes collection of DNA samples from all felony arrestees, whereas the Maryland law only authorized collection from those individuals accused of committing specific felony crimes.  (*Buza, supra*, 4 Cal.5th at p. 674.)  The defendant emphasized the United States Supreme Court's statement that " 'the necessary predicate of a valid arrest for a serious offense is fundamental,' " as well as the high court's references to arrests for " 'violent' " or " 'dangerous' " crimes.  (*Ibid*.)  However, our high court reasoned that the defendant "read too much into the language on which he relies," and recognized that "[t]he high court identified the question before it more generally as 'whether the Fourth Amendment prohibits the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on *felony* charges.'  [Citation.]  And as a matter of

32

ordinary usage, a felony is considered a 'serious' offense." (*Ibid.*) The court concluded that the high court in *King* did not "limit its holding to those felonies that happen to be classified as 'violent' or 'dangerous' as a matter of state law, nor did it purport to create a new classification of violent offenses as a matter of federal constitutional law." (*Buza*, at pp. 674-675.) The court further noted that the defendant was, in fact, arrested for felony arson, a serious felony under California law.[13] (*Id.* at p. 675.)

Regarding the defendant's second point—that the DNA Act authorizes collection and testing of DNA samples before an accusatory pleading has been filed and before there is a judicial determination of probable cause—the *Buza* court reasoned that the defendant's argument consisted of two elements, one as to the timing of the collection of the DNA sample, and the other as to the timing of the analysis of the sample. (*Buza, supra*, 4 Cal.5th at p. 676.) Our high court stated that there was no reason to believe that any difference between the California and Maryland laws altered the Fourth Amendment balance, concluding that obtaining *and analyzing* the sample was part of a legitimate booking procedure. Our high court stated: "the reasoning of *King* itself does not lend substantial support to the argument that" a guarantee that no DNA analysis will occur until probable cause is confirmed by a neutral magistrate or charges are filed is required. (*Id.* at p. 677.) "Again, *King* approved 'DNA identification'—*which necessarily involves both taking and analyzing the sample*—as a 'legitimate police booking procedure' that enables law enforcement to know whom they have in custody. [Citation.] *That interest is one that attaches as soon as the suspect is 'formally processed into police custody*.'

---

[13] Likewise, we note that defendant here was arrested for spousal rape, a crime that has been legislatively classified as a violent and serious felony under California law. (§ 667.5, subd. (c)(3); 1192.12, subd. (c)(3).) He was also arrested for domestic violence, a violation of section 273.5. We also note that Maryland's law defined crime of violence as including rape and sexual assaults. (*King*, *supra*, 569 U.S. at p. 443.)

33

[Citation.]  The [high] court attached no significance to the timing provision of the Maryland statute on which defendant relies." (*Ibid.*, italics added.)

The court in *Buza* also rejected the defendant's contention that the collection of a felony arrestee's DNA sample should wait until a prosecutor has decided whether to file charges or a judge makes a probable cause determination.  (*Buza, supra*, 4 Cal.5th at pp. 677-678.)  The defendant's argument was premised, in part, on the fact that a probable cause determination ordinarily occurs within 48 hours after booking, while generating a DNA profile from an arrestee's DNA sample takes much longer, and therefore it would pose little burden to postpone processing the DNA sample until after a probable cause determination is made and charges are filed.[14]  (*Ibid.*)  However, the *Buza* court recognized, as did the Supreme Court in *King* (*King, supra*, 569 U.S. at pp. 454, 459-460), that any given DNA sample may be processed significantly more quickly than the average, and average processing times are likely to decrease as the technology evolves and becomes more widespread.  (*Buza*, at p. 678.)  The *Buza* court further noted that "the high court had been told that the technological capacity already exists to analyze DNA samples in a matter of minutes, rather than days or weeks, and that technology is likely to become more widespread in the near future."  (*Ibid.*)  Accordingly, the *Buza* court rejected the defendant's argument that there was no meaningful risk of interference with the identification interest by a rule delaying the collection or processing of samples until after a judicial probable cause finding or arraignment.  (*Ibid.*)

Addressing Justice Liu's dissent in *Buza*, the majority stated:  "Justice Liu suggests that for purposes of deciding reasonableness of an arrestee's search, an arrest

---

[14]  In *Buza*, the defendant asserted in California it has typically taken an average of 30 days to generate an identification profile from an arrestee's DNA sample.  (*Buza, supra*, 4 Cal.5th at p. 677.)  Citing California Department of Justice statistics, the People assert the average turn-around time was 18 days in 2015.

should not be considered valid until there has been a judicial determination of its validity. [Citation.]  There is, however, a meaningful difference between the requirement of a valid arrest and a requirement that a neutral magistrate make such a determination.  For example, in the related context of searches incident to arrest—where a valid arrest is also essential—there is no such preapproval requirement.  [Citations.]  The arrestee may have an exclusionary remedy if the arrest is later determined to have been illegal [citation], but the search's reasonableness does not depend on prior judicial authorization for the arrest.  Here, there is no dispute that the arrest was valid.  . . .  [W]e decline to decide the constitutional necessity of such a rule *in a case in which probable cause has never been contested.*"  (*Buza, supra*, 4 Cal.5th at pp. 679-680, italics added.)

Regarding the defendant's third point concerning the expungement procedure in the DNA Act and how it differs from that in the Maryland law considered in *King*, the *Buza* court reasoned that, because the defendant never sought expungement and never claimed to be entitled to expungement, "we have no occasion here to resolve any questions that might arise about the implementation of the expungement provisions in other cases.  It suffices to note that many of defendant's assertions about the operation of the expungement process are, at this point, necessarily speculative."  (*Buza, supra*, 4 Cal.5th at p. 683.)

Concerning the search and seizure provision under article I, section 13 of our state's Constitution, the *Buza* court evaluated that state constitutional claim "by employing the same mode of analysis that the high court applied in *King*" to analyze the reasonableness of the search under the Fourth Amendment.  (*Buza, supra*, 4 Cal.5th at p. 684.)  "[W]e determine whether the intrusion on the defendant's expectation of privacy is unreasonable by applying 'a general balancing test 'weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty.' "  Acknowledging the independent force of our state's

Constitution on search and seizure issues where Proposition 8's Truth-in-Evidence provision is not controlling (*id*. at pp. 685-687), our high court reasoned that the question it had to resolve was "whether adequate reasons are present here to conclude, despite *King*, that California voters exceeded constitutional bounds in mandating the collection of DNA sample from an individual arrested and booked on probable cause to believe he had committed a serious offense." (*Id*. at p. 687.) The court concluded there were not. (*Id*. at p. 691.)

Our high court noted that, before *King*, it had already recognized the identification interest in its earlier DNA decision in *Robinson*. (*Buza, supra*, 4 Cal.5th at pp. 687-688, citing *Robinson*, *supra*, 47 Cal.4th at p. 1134.) In *Robinson*, the court held that DNA mistakenly collected from a person convicted of a non-qualifying offense later used to link him to a sexual assault committed before the arrest in which the DNA was collected was not a violation of the Fourth Amendment and the DNA evidence need not be suppressed. (*Robinson*, at pp. 1119-1123.) Quoting *Robinson*, the *Buza* court stated: " ' "for purposes of identifying 'a particular person' as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible." ' " (*Buza*, at pp. 687-688.) A genetic code is far more precise than a physical description or a name. (*Id*. at p. 688.) The court further noted that "identification of arrestees is not an end in itself; rather, the primary purpose of identification is to facilitate the gathering of information about the arrestee contained in police records, which in turn informs decisions about how to proceed with the arrestee." (*Ibid*., citing *Loder v. Municipal Court* (1976) 17 Cal.3d 859, 866-867 (*Loder*) [upholding retention and use of arrest records, including fingerprints and other identifying information].)

In rejecting the state constitutional claim, our high court also noted that *King* flatly rejected the argument that the delay in obtaining a DNA identification negates the utility of DNA as a means of identification when compared to fingerprinting, which provides more immediate results. (*Buza, supra*, 4 Cal.5th at p. 688.) The *Buza* court recognized

36

that "the immediate availability of fingerprints for identification purposes is . . . a relatively recent development." (*Ibid*.) At one time, fingerprint identification took weeks or months, but "[s]uch delays have not been thought to undermine the basic identification purposes of the information." (*Ibid*.)

On the privacy side of the state constitutional balance, the *Buza* court rejected the defendant's argument that the high court in *King* did not adequately address what Buza referred to as "the more significant privacy implications posed by the state's subsequent analysis and retention of the sensitive information contained in DNA." (*Buza, supra*, 4 Cal.5th at p. 689.) This criticism, the *Buza* court declared, "is misplaced." (*Ibid*.) The court then went on to highlight the minimal nature of the physical intrusion associated with a buccal swab and the scientific and legislative safeguards that minimize any privacy intrusion discussed in *King*, including California's specific statutory safeguards against the wrongful use or disclosure of an arrestee's DNA information. (*Id*. at pp. 689-690, 692.)

The court in *Buza* summarized: "Our holding today is limited. The sole question before us is whether it was reasonable, under either the Fourth Amendment or article I, section 13 of the California Constitution, to require the defendant in this case to swab his cheek as part of a routine jail booking procedure following a valid arrest for felony arson. Because we conclude the requirement was reasonable as applied to defendant, we hold he is subject to the statutory penalties prescribed in . . . section 298.1." (*Buza, supra*, 4 Cal.5th at p. 691.)[15]

---

[15] In his dissent, Justice Liu concluded that the defendant's conviction for refusing to comply with the DNA Act was invalid under the California Constitution right against unreasonable searches and seizures. (*Buza, supra*, 4 Cal.5th at p. 704 (dis. opn. of Liu, J.).) He did not consider validity under the Fourth Amendment. (*Ibid*.) Justice Cuéllar, also dissenting, likewise concluded that the DNA Act is unconstitutional under the California Constitution as applied to felony arrestees, "individuals . . . who are not yet known to be lawfully arrested" based on a determination by a neutral magistrate. (*Id*. at

37

## 2. *Haskell I*

In *Haskell I*, a class action under 42 U.S.C. § 1983, the plaintiffs challenged the constitutionality of the DNA Act in an effort to enjoin the collection of DNA from California arrestees solely based on an arrest for a felony offense. (*Haskell I*, *supra*, 745 F.3d at p. 1270.) After a majority of the assigned panel affirmed the denial of the injunction, an en banc panel of Ninth Circuit also denied the injunction, concluding, several months before our high court's decision in *Buza*, that the plaintiffs failed to establish a likelihood of success on the merits because the DNA Act does not violate the Fourth Amendment. The court framed the issue and expressed its holding as follows: "Plaintiffs' facial and as-applied challenges turn on essentially the same question: Is California's DNA collection scheme constitutional as applied to *anyone* 'arrested for*, or charged with, a felony offense by California state or local officials?' After *Maryland v. King* [citation], the answer is clearly yes." (*Id*. at p. 1271, italics added.) Upon affirming the denial of the preliminary injunction, the court remanded the matter back to the district court after the plaintiffs requested an injunction applicable to a smaller class of people arrested for felonies they asserted were not covered by *King*. (*Ibid*.)

In a concurring opinion, Judge Milan D. Smith, Jr.,[16] elaborated, stating: "[t]he Supreme Court's decision in *King* is fatal to Plaintiffs' claims" and after *King*, the plaintiff's constitutional challenges to the DNA Act "are clearly without merit." (*Haskell I, supra,* 745 F.3d. at p. 1272 (conc. opn. of Smith, J.).) Calling the asserted distinctions between the Maryland and California statutes "illusory," Judge Smith reasoned that "California's DNA collection law is materially indistinguishable from the Maryland law

---

p. 726 (dis. opn. of Cuéllar, J.).) He concluded the DNA Act violates both the state constitutional provision prohibiting unreasonable searches and seizures, as well as our state's constitutional right to privacy.

[16] Judge Smith was the author of the original majority opinion issued by the three-judge panel. (See *Haskell v. Harris* (9th Cir. 2012) 669 F.3d 1049.)

38

upheld in [*King*]." (*Id*. at pp. 1271, 1272.) Regarding plaintiffs' claims that the filing of formal charges and a judicial determination of probable cause should be conditions precedent to permissible DNA collection and analysis, Judge Smith wrote: "In light of the Supreme Court's focus on the collection of DNA samples in connection with arrest and booking, Plaintiffs' argument that the filing of charges and a judicial probable-cause determination are conditions precedent to permissible DNA collection is unsupportable. Refusing to draw such a line makes good sense. The government's interest in identifying arrestees attaches 'when an individual is brought into custody,' [citation], irrespective of whether the suspect is ultimately charged." (*Id*. at p. 1274.)

### 3. *Haskell II*

On remand to the district court, the *Haskell* plaintiffs, who represented members of a class who were arrested but against whom no formal charges were filed, argued they were entitled to an injunction. (*Haskell v. Brown* (2018) 317 F.Supp.3d 1095, 1097, 1099 (*Haskell II*).) They argued that, while obtaining the DNA sample after the arrest may be constitutional, the state could not justify analyzing a DNA sample taken after arrest when the arrestee is no longer accused of a crime. (*Id*. at p. 1100.) More specifically, they argued, " '[e]ven if the Fourth Amendment allows the government to seize a DNA sample from everybody arrested on suspicion of a felony, once the government determines that it will not prosecute a person, or charges are dismissed, the government's interests no longer justify analyzing that sample to obtain a DNA profile.' " (*Id*. at p. 1099.)

Based on the theory that the governmental interests discussed in *King* no longer prevail if the prosecutor decides not to file formal charges, the plaintiffs suggested a rule allowing law enforcement to seize a sample from all felony arrestees, but delay the analysis until a prosecutor files formal charges. (*Haskell II, supra*, 317 F.Supp.3d at p. 1099.) The district court rejected the argument, noting that "*King* does not separate out the two steps in DNA identification," collection and analysis. (*Id*. at p. 1100.) Rather,

39

"*King* held that the government's interests attach when an individual is taken into custody." (*Ibid*.) The district court noted that the court in *Buza* recognized that *King* said " 'DNA identification' . . . necessarily involves both taking and analyzing the sample.' " (*Ibid*., quoting *Buza, supra*, 4 Cal.5th at p. 677.) Thus, the district court reasoned both the *King* and *Buza* courts treated taking and analyzing the DNA sample "as part of a single 'identification' process, rather than two independent searches." (*Haskell II*, at pp. 1100-1101.) "*King* did not view DNA analysis as a separate search for evidence." (*Id*. at p. 1102.) Moreover, as the district court and the *Buza* court noted, the high court in *King* concluded that analysis of the DNA sample, once collected, does not result in a privacy intrusion that violates the federal Constitution. (*Id*. at p. 1101, citing *King*, *supra*, 569 U.S. at p. 464 & *Buza*, at p. 673.)

The district court rejected the plaintiffs' argument that the time lapse between taking the sample and analysis means the two should not be paired together. Looking to the future, the court reasoned that it is indisputable that "the time between the two steps is shrinking" and "it is not difficult to imagine that what once took months will soon take minutes." (*Haskell II*, *supra*, 317 F.Supp.3d at p. 1102.) In any event, as the district court noted, the *King* and *Buza* courts had already rejected the argument. (*Ibid*.) Based on the forgoing, the district court rejected plaintiffs' contention "that even if it is permissible to take an arrestee's DNA at booking, it is unconstitutional to analyze that sample until or unless the arrestee is charged with a crime." (*Id.* at p. 1103.)

The district court reasoned that three of the government interests in *King* apply in the context of analyzing DNA from an arrestee even after formal charges have not been filed -- the identification interest, dangerousness assessment interest and exoneration of innocent persons interest. (*Haskell II*, *supra*, 317 F.Supp.3d at pp. 1104-1106.) Regarding the identification interest, the district court reasoned, "[t]he government interest in identifying arrestees—both who they are and what they have done—is present even if the arrestee is not ultimately charged with the felony for which he has been

40

arrested. … Such an individual might still be linked to a previous crime." (*Id.* at p. 1104.) The court noted that fingerprints and photographs are obtained for the same identity purpose, retained by the government when arrestees are not charged, and are later used for the same purpose. (*Ibid.*) "DNA is no different." (*Ibid.*)

As for the public danger assessment interest, while bail determinations do not apply to people who are not formally charged, taking the arrestee's DNA at booking gives law enforcement an early view into the arrestee's dangerousness. For those released on bail, that information could be used to revisit that person's pretrial release status. (*Haskell II, supra*, 317 F.Supp.3d at p. 1105.) Again, this interest attaches at booking.

Regarding the exoneration of innocent persons interest, the district court stated: "there is no question either that DNA evidence leads to exonerations, or that exonerations are a worthy interest." (*Haskell II, supra*, 317 F.Supp.3d at p. 1105.) The court reasoned that "[w]hether the government interest in exoneration can 'alone' justify the DNA searches . . . is beside the point, given the other government interests present. [¶] The Supreme Court in *King* gave 'great weight' to the 'significant government interest at stake' in arrestee DNA analysis. [Citation.] The government's interests in identifying arrestees, in assessing their dangerousness, and in exonerating the innocent, present in *King*, are also present in the case of individuals arrested for felonies but not charged." (*Id.* at p. 1106.)

Weighing the government's interest against the arrestee's "modest interest" discussed in *King*, the district court concluded DNA Act searches are reasonable, even when the arrestee is not formally charged by the prosecutor. (*Haskell II, supra*, 317 F.Supp.3d at p. 1106.)

## G. Analysis

### 1. Fourth Amendment

We begin with the holding in *King*: "When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*King*, *supra*, 569 U.S. at pp. 465-466.) Based on the reasoning in *King* underlying this holding, and the reasoning in *Buza*, we conclude this holding applies here, even though formal charges were not ultimately filed against defendant. Our conclusion is buttressed by the Ninth Circuit and district court opinions in *Haskell I* and *Haskell II*, which we find persuasive.

In his original briefing, defendant made the same arguments addressed in *Buza* and the two *Haskell* cases in an effort to disconnect himself from the holding in *King*. He argued that *King* did not apply because, unlike the Maryland law addressed in *King*, the DNA Act (1) allows the collection of DNA from any adult charged with any felony offense, (2) does not require that formal charges be filed and a judicial determination of probable cause be made before an arrestee's DNA can be uploaded into the national database, and (3) does not require automatic expungement of an arrestee's DNA profile when no formal charges are filed or if there is no conviction. He makes the same arguments post-*Buza* in his supplemental briefing. He argues he is not in the same class of arrestee as the defendants in *King* and *Buza*. He notes that the *Buza* court did not answer the specific issue presented here—whether the Fourth Amendment and his privacy interests were violated by the seizure and testing of his DNA when it was obtained in connection with an arrest for which no formal charges were filed. (*Buza*, *supra*, 4 Cal.5th at p. 665.) He points out that the court in *Buza* stated: " '[W]e express no view on the constitutionality of the DNA Act as it applies to other classes of

42

arrestees.' " According to defendant, his circumstances meaningfully alter the constitutional balance struck in *King* and *Buza*. We disagree.

Governmental interests identified in *King* and discussed in *Buza* apply here. The high court was clear that each of the interests "attaches as soon as the suspect is 'formally processed into police custody" after having been arrested based on probable cause. (*Buza, supra*, 4 Cal.5th at p. 449.) Taking the swab at that point constitutes "a reasonable search that can be considered part of a routine booking procedure." *(King, supra*, 569 U.S. at p. 465.) Thus, the counterbalancing government interests attach the moment a person is arrested based on probable cause and undergoes the booking process. As for the analysis of the buccal swab, even though our high court in *Buza* indicated its holding was narrow, it nevertheless stated: "the reasoning of *King* itself does not lend substantial support to the argument that" a guarantee is required that no DNA analysis will occur until probable cause is confirmed by a neutral magistrate or charges are filed. (*Buza,* at p. 677.) "Again, *King* approved 'DNA identification'—*which necessarily involves both taking and analyzing the sample—*as a 'legitimate police booking procedure' that enables law enforcement to know whom they have in custody. [Citation.] That interest is one that attaches as soon as the suspect is 'formally processed into police custody.' " (*Ibid*., italics added; see also *Haskell II*, *supra*, 317 F.Supp.3d at p. 1100.)

The electorate's declaration in amending the DNA Act in Proposition 69 recognizes the well-established identification interest: "The state has a compelling interest in the accurate identification of criminal offenders." (Prop. 69, *supra*, § II, subds. (e), (f).) The voters further noted: "Like the collection of fingerprints, the collection of DNA samples pursuant to this chapter is an administrative requirement to assist in the accurate identification of criminal offenders." (§ 295, subd. (d).) Long before *King*, our high court recognized the import of this governmental interest in the context of DNA collection and analysis and the utility of DNA for fulfilling that interest. (*Buza*, *supra*, 4 Cal.5th at pp. 687-688, citing *Robinson*, *supra*, 47 Cal.4th at pp. 1121, 1134.) DNA

43

collection and analysis is a booking process just like the common practices of taking mug shots and fingerprinting, and " '[i]ndividuals in lawful custody cannot claim privacy in their identification.' " (*Buza*, at p. 687, quoting *Robinson*, at p. 1121.)

Moreover, as the high court in *King* noted regarding fingerprinting, "[f]inding occurrences of the arrestee's CODIS profile in outstanding cases is consistent with this common practice.  It uses a different form of identification than a name or fingerprint, but its function is the same." (*King, supra,* 569 U.S. at p. 452.)  As DNA matching technology improves, like fingerprint technology did, we can look forward to the time when the efficacy of DNA as an identification metric will yield matches as quickly as fingerprints.  (*King,* at p. 459; *Haskell II*, *supra*, 317 F.Supp.3d at p. 1103.)  Accordingly, "[i]n the balance of reasonableness required by the Fourth Amendment, . . . [we] must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest." (*King,* at p. 461.)  In our view, placing DNA collection and analysis in the same category as mug shots and fingerprints—neither of which are destroyed when formal charges are not filed and both of which remain available for use in other investigations—indicates the high court in *King* did not and would not consider formal charges, a judicial probable cause determination, or a conviction to be constitutionally significant events relative to the reasonableness of collecting and analyzing DNA as part of a booking process.  The government interest in identifying arrestees attaches when an individual is brought into custody, "irrespective of whether the suspect is ultimately charged." (*Haskell I*, *supra*, 745 F.3d at p. 1274 (conc. opn. of Smith, J.).)

Regarding the risk assessment interest recognized in *King* and *Buza*, again that interest attaches the moment a person is booked based on an arrest supported by probable cause.  And in determining risk, custodial authorities need to know what other offenses the arrestee has committed and whether there are prior convictions, pending cases, or unsolved crimes.  They need to know whether the arrestee is " 'wanted for another

44

offense.' " (*King, supra*, 569 U.S. at p. 452.)  The *King* court did not distinguish between offenses for which the arrestee had been previously identified as the perpetrator and those where a DNA match identifies him as the perpetrator of a previously unsolved crime.  As we see it, the *King* court's reasoning applies to both situations, and for purposes of this governmental interest, we see no difference.  Thus, in the future, when DNA analysis becomes as rapid as fingerprint matches and an arrestee's DNA is linked to the commission of a heinous unsolved crime, custodial personnel will know the arrestee has a heightened incentive to escape because of his involvement in that unsolved crime.

As for the dangerousness assessment interest, knowledge about an arrestee's past conduct is critical at all stages.  Knowing, based on DNA identification, that a defendant is wanted for a previous violent crime is probative of the court's consideration of " 'the danger of the defendant to the alleged victim, another person, or the community.' " (*King, supra*, 569 U.S. at p. 453.)  And if a DNA hit takes place after pretrial release, "revealing the defendant's unknown violent past," that information " 'can and should' lead to revocation of the arrestee's release." (*Id*. at p. 455; see also *Buza, supra*, 4 Cal.5th at p. 689 [even DNA identification information obtained months later can be considered in reevaluating an initial release determination or determining to impose new release conditions and it may also influence custodial housing decisions].)  Similarly, a DNA hit determined after a prosecutor initially declines to file formal charges on the current arrest could, and in many cases will, result in a reevaluation of that charging decision.  A prosecutor's charging decision is not necessarily permanent, and a defendant could later be formally charged as long as the filing is made within the applicable statute of limitations.  And in such a situation, the defendant's DNA profile would be available for purposes of confirming his identity upon rearrest.

Finally, while the exoneration of innocent persons interest attaches at the time of booking for an arrest based on probable cause, this interest continues even if formal charges are not filed on the current arrest. (*Haskell II, supra*, 317 F.Supp.3d at p. 1106.)

45

Prompt DNA testing prevents "the grotesque detention of . . . innocent people." (*King, supra*, 569 U.S. at p. 455.) "DNA evidence leads to exonerations" of persons wrongly accused and "exonerations are a worthy interest." (*Haskell II,* at p. 1105.) The electorate recognized this in enacting the DNA Act, the formal name of which includes the words "Innocence Protection." The electorate declared in Proposition 69 that there is a "critical and urgent need" to provide law enforcement with the technology to "expeditiously . . . exonerat[e] persons wrongly suspected or accused of crime" and "prevent time-consuming and expensive investigations of innocent persons." (Prop. 69*, supra*, § II, subds. (b), (e).) It further declared that expanding the DNA data base is a "means to ensure that persons wrongly suspected or accused of crime are quickly exonerated so that they may reestablish their standing in the community." (Prop. 69*, supra*, § II, subd. (g).) This government interest is on full display in the instant case, where S.L. and Christopher could not be truly exonerated until the DNA found on the cigarette butts and Jessica's belt buckle was linked to defendant and law enforcement determined there was no connection between defendant and those individuals.

We conclude that at the time of booking, "there can be little reason to question 'the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested [and] in knowing whether he is wanted elsewhere' " (*King, supra*, 569 U.S. at p. 461), even if a prosecutor's office later decides not to file formal charges. Nor can it be questioned that determining an arrestee's dangerousness and the potential for exoneration of innocent persons are legitimate governmental interests to weigh in the balance, even when formal charges are not filed. And in a situation where the prosecutor reevaluates the original decision declining to file charges, decides to do so and the defendant is then rearrested, the defendant's DNA will be available to confirm his identity and for purpose of risk assessment in the custodial setting.

Looking at the privacy side of the balance, there is no dispute here that defendant's arrest was supported by probable cause. Consequently, his expectation of

46

privacy was diminished. (*King, supra*, 569 U.S. at pp. 461, 463; *Buza*, *supra*, 4 Cal.5th at p. 673.) The court in *King* stated, "[i]n light of the context of a valid arrest supported by probable cause [the defendant's] expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks." (*King*, at p. 465.) The high court did not even hint that later events such as the filing of formal charges, a judicial probable cause determination, or a conviction would need to be weighed into the balance. Regarding the physical intrusion in obtaining the sample, the buccal swab process is a "minimal intrusion," (*id*. at p. 459; *Buza*, at pp. 672-673), and only minimally more intrusive than fingerprinting (*King,* at p. 469).

Additionally, a California arrestee's privacy is protected by the same scientific and statutory safeguards discussed in *King*. (*King, supra*, 569 U.S. at pp. 442-444; *Buza, supra*, 4 Cal.5th at pp. 681, 692.) The DNA analyzed is non-sensitive junk DNA, not suitable for genetic determinations other than identification. (*Buza*, at p. 673.) It is a genetic fingerprint, but it is not, as defendant suggests, the equivalent of medical history information. (See *United States v. Mitchell* (3rd Cir. 2011) 652 F.3d 387, 408 [" 'DNA profiles, which embody information concerning 13 "core loci," amount to "genetic fingerprints" that can be used to identify an individual uniquely, but do not disclose an individual's traits, disorders, or dispositions' "].) In California, misuse of a DNA profile is subject to criminal penalties.[17] It is certainly possible that, in the future, the 13 loci

_____

[17] As our high court in *Buza* noted: "Information obtained from an arrestee's DNA is confidential and may not be disclosed to the public. [Citation.] DNA samples and the biological material from which they are obtained may not be used 'as a source of genetic material for testing, research, or experiments, by any person, agency, or entity seeking to find a causal link between genetics and behavior or health.' [Citation.] Any person who knowingly uses a DNA sample or profile for any purpose other than 'criminal identification or exclusion purposes' or 'the identification of missing persons,' or who 'knowingly discloses DNA or other forensic identification information . . . to an unauthorized individual or agency' for any unauthorized reason is subject to criminal prosecution and may be imprisoned for up to three years and fined up to $10,000.

constituting junk DNA could be used to make other, more private genetic determinations; but other than pure speculation, there is nothing before us from which to infer science will move in that direction. And such speculation should not be part of a Fourth Amendment analysis. On balance, the government interests clearly outweigh defendant's privacy interests.

We disagree with defendant's premise that what subsequently happened after booking—that he was neither formally charged nor subject to a probable cause determination by a neutral magistrate—meaningfully alters the Fourth Amendment calculus.[18] The reasoning in *King* and *Buza* set forth *ante* implicitly disposes of defendant's contentions. Indeed, as noted, the high court in *King* never suggested the applicability of the governmental interests that attach upon an arrest based on probable cause should be reevaluated or reconsidered depending on later proceedings in the criminal justice process, including a prosecutorial charging declination. No such rule is required for other common identification evidence collected at booking like photographs and fingerprints, and we see no reason why such a rule should be required for DNA profiles generated from junk DNA obtained from a person by buccal swab after a valid arrest as part of the booking process. (See *Loder, supra*, 17 Cal.3d at pp. 865-868 [reasoning that the multiple purposes for which police, prosecutors, courts, and probation and parole authorities may consult records of arrests not resulting in conviction, including fingerprint records and photographs, constitute a substantial governmental interest].)

---

[Citation.] The Department of Justice is also subject to civil damages for knowing misuse of a sample or profile by any of its employees." (*Buza*, *supra*, 4 Cal.5th at p. 667.)

[18] Again, we note that the record does not establish whether there was a probable cause determination by a neutral magistrate or not. (See fn. 8, *ante*.) But whether there was or was not makes no difference here, where the record establishes there was probable cause for arrest.

Regarding a judicial determination of probable cause, we note here that defendant never challenged the constitutional validity of his May 2013 arrest. (See generally *Buza, supra*, 4 Cal.5th at pp. 679-680 [addressing the dissent's suggestion that arrest should not be deemed valid until there is a judicial determination of validity, and observing that, in the case before it, there was no dispute the arrest was valid].) To the contrary, defendant here stipulated that his arrest was lawful, as it was based on probable cause. The parties' stipulation characterized defendant's May 30, 2013, arrest as a "*lawful arrest* for a felony, *based upon the officer's finding probable cause.*" (Italics added.) Thus, this case does not present a situation where the validity of the arrest is in question. In such a circumstance, whether DNA evidence collected at booking should be suppressed presents an entirely different question. (Cf. *People v. Marquez* (2019) 31 Cal.App.5th 402, 410-411 [concluding the DNA collection violated the Fourth Amendment because the prosecution failed to establish the defendant's arrest was supported by probable cause or, given an unexplained four-day delay between arrest and obtaining the buccal sample, that his DNA was collected a part of a routine booking procedure].)

As to the prosecutorial charging declination, the court in *Buza* impliedly addressed the argument defendant makes here. The court stated: "Although defendant himself was charged and convicted, we acknowledge defendant's concern about the collection of DNA samples from other individuals who are booked into custody but who ultimately will never be charged with a qualifying crime, or against whom qualifying charges will ultimately be dismissed. *Voters responded to that concern* by providing for a particular remedy—expungement of the DNA sample and associated records—when the suspect is cleared of qualifying charges. As *King* illustrates, voters could also have chosen to require that all sample processing be postponed until after arraignment, regardless of technological capacity to proceed more quickly. *But given the basic logic of King, we cannot say that the choice voters made is one that undermines the reasonableness of the*

49

*search in this case*." (*Buza, supra*, 4 Cal.5th at p. 679, italics added.) We conclude the same about the reasonableness of the search in the case before us.

Defendant argues that each time his DNA was run in CODIS and compared to other profiles, it was, in effect, subjected to additional searches after his release. We disagree. As the *King*, *Buza*, and *Haskell* courts have emphasized, defendant's DNA profile is like his mugshot and fingerprints. And fingerprints and photographs are both available for law enforcement use once constitutionally obtained. Moreover, it is hard to see how the subsequent comparisons of defendant's DNA profile can even be classified a search. As recognized by the courts in *King* and *Buza*, the search that is subject to Fourth Amendment analysis takes place when the buccal swab sample is obtained and even "the analysis of the DNA sample, once collected, does not result in a privacy intrusion that violates the federal Constitution." (*Buza, supra*, 4 Cal.5th at p. 673, citing *King*, *supra*, 569 U.S. at p. 464.) In our view, repeated comparison of an arrestee's validly obtained and recorded DNA profile to the profiles in CODIS is no more a search than are future uses of mugshots for photo lineups or comparisons of fingerprints to latent prints found at an unrelated crime scene. (See *Johnson v. Quander* (D.C. Cir. 2006) 440 F.3d 489, 499 [a DNA profile is like a snapshot taken in conformance with the Fourth Amendment and the government's storage and use of it does not give rise to an independent Fourth Amendment claim]; see also *Haskell II*, *supra*, 317 F.Supp.3d at p. 1102, quoting *Johnson*, at p. 498.) Once an arrestee's DNA is validly obtained and analyzed as part of the booking procedure and his or her profile becomes known and recorded, there is no additional intrusion into the arrestee's privacy by comparing it to other profiles. (See *Johnson*, at pp. 498-499 [concluding that comparing DNA profiles in CODIS is not a search for Fourth Amendment purposes; "the process of matching one piece of personal information against government records does not implicate the Fourth Amendment"].) Rather, a recorded profile, once validly obtained, is essentially in the plain view of law enforcement. (See *Arizona v. Hicks* (1987) 480 U.S. 321, 324-325 [94 L.Ed.2d 347]

[noting that observing a turntable in plain view while law enforcement executes a valid search warrant for other items does not constitute an independent search, because the mere observation of the turntable produces no additional invasion of the defendant's privacy interest].) And there is no constitutional impediment to matching information against other governmental records when that information is in law enforcement's plain view as the result of a valid search.

Regarding defendant's argument that the DNA Act is constitutionally defective because it does not provide for automatic expungement, we agree with the district court in *Haskell II*. "[C]ourts have not held that a state must always return fingerprints or other identifying information taken at arrest. [Citations]. The court in *Buza*, [citation], also observed that 'retention of an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally has not been thought to raise constitutional concerns, even though the arrestee may later be exonerated.' " (*Haskell II, supra,* 317 F.Supp.3d at p. 1110, quoting *Buza, supra,* 4 Cal.5th at p. 680.) And as the *Buza* court observed, nothing in *King* suggested that the automatic expungement component of the Maryland law was constitutionally significant. (*Buza,* at p. 680.) The Maryland expungement procedure was simply not part of King's Fourth Amendment analysis. (*Haskell II,* at p. 1111.) Given the high court's holding that DNA serves the same function as photographing and fingerprinting, we conclude automatic expungement is not constitutionally required.

Nor do we find anything in California's expungement procedures that tilts the balance to a violation of the felony arrestee's Fourth Amendment rights. Focusing on various expungement provisions, defendant argues the process for obtaining an expungement is illusory. We need not detail those provisions here. Suffice it to say we agree with the district court in *Haskell II* that "[t]here is no reason to believe that the California law's inclusion of a somewhat more burdensome process for accomplishing [expungement than the Maryland law] would so alter the balancing test as to change its

51

outcome. Instead, California's expungement process is an inconsequential example of how states' laws 'vary in their particulars' from the Maryland law." (*Haskell II, supra*, 317 F.Supp.3d at p. 1111.)

Furthermore, to our knowledge, defendant never availed himself of the expungement procedures he characterizes as inadequate here. (See generally *Buza, supra*, 4 Cal.5th at p. 683 [court stated it had no occasion to address issues the defendant raised regarding the statutory expungement procedures where he did not seek expungement and concluding many of the defendant's assertions on this topic were necessarily speculative].) Indeed, defendant here actually invited the investigators to check his DNA in the database when he said to them at the conclusion of the initial interview, "Um, I'd offer DNA and fingerprints, but honestly, I'm already in the system. *So you guys can run me*." (Italics added.)

We conclude that the DNA Act, as applied to defendant here, did not violate the Fourth Amendment.

## 2. California Constitutional Right Against Unreasonable Search and Seizure

Defendant asserts that the California Constitution independently protects him above and beyond the federal constitution. The court in *Buza* recognized, "the California Constitution is, and has always been, ' "a document of independent force" ' [citation] that sets forth rights that are in no way 'dependent on those guaranteed by the United States Constitution.' " (*Buza, supra*, 4 Cal.5th at p. 684; see Cal. Const., art. I, § 24.)

However, the *Buza* court made clear, "We evaluate the constitutionality of searches and seizures under our state Constitution by employing the same mode of analysis that the high court applied in *King* [citation]. That is, we determine whether the intrusion on the defendant's expectation of privacy is unreasonable by applying 'a general balancing test 'weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty.' "

(*Buza, supra*, 4 Cal.5th at p. 684.) Employing that same balancing analysis and the reasoning in *King*, our high court concluded the DNA Act did not violate the California Constitution as applied to *Buza*. (*Id*. at pp. 684-691.)

Defendant in making his state constitutional claim again asserts that none of the considerations or rationales relied upon in *King* and *Buza* apply to an arrestee who is released from jail without formal charges having been filed. And again, we disagree. For reasons previously discussed, we conclude the identification, risk assessment, dangerousness assessment, and exoneration interests applicable to the Fourth Amendment contention apply to defendant's state constitutional claims. On balance, we conclude the aforementioned four interests weigh in favor of a finding of reasonableness as to defendant's California search and seizure claim.

Defendant also relies on the absence of an automatic expungement provision in the DNA Act in arguing that it violates California's Constitution. However, for the same reasons discussed *ante* relative to the Fourth Amendment analysis, we do not agree that the absence of automatic expungement compels the conclusion that the DNA Act, or its application to defendant, violates article I, section 13, of the California Constitution.

On the privacy side of the California Constitution balance, defendant acknowledges that the *Buza* court factored in what it considered "heightened privacy interests in the sensitive information that can be extracted from a person's DNA" and that these interests implicate California's constitutional search and seizure provision. (*Buza, supra*, 4 Cal.5th at pp. 689-690.) But the court in *Buza* went on to note that, even under cases involving California's right to privacy under article I, section I, its "cases have . . . recognized that safeguards against the wrongful use or disclosure of sensitive information may minimize the privacy intrusion when the government accesses personal information, including sensitive medical information." (*Id*. at p. 690.) The court went on to state: "Here, the DNA Act makes the misuse of a DNA sample a felony, punishable by years of imprisonment and criminal fines. [Citation.] These strong sanctions substantially reduce

53

the likelihood of an unjustified intrusion on the suspect's privacy. Like the *King* court, we acknowledge the possibility that technological change might alter the privacy interests at stake, requiring a new constitutional analysis. But we are no more inclined than that court to decide cases on the basis of speculation about future developments that may not come to pass." (*Ibid*.)

Defendant attempts to add weight to the privacy side of the balance, asserting "[t]he DNA sample analyzed and stored by the state contained [his] *entire genetic code*, deeply personal information that surely falls within the realm of guaranteed informational privacy" and equates it to medical history. (Italics added.) Defendant exaggerates. As *King* and *Buza* recognized, the DNA analysis done by the state reveals junk DNA. It is not his entire genetic code. Under current technology, it is suitable only for identification purposes. Nothing about the fact that defendant was not formally charged warrants a deviation from *King's* and *Buza's* analysis on this point. As of now, what is at issue is "junk DNA" suitable only for identification purposes, not a person's entire genetic code.

Relying on Justice Cuéllar's dissenting opinion in *Buza*, defendant asserts that "the processing, storage and comparison of an arrestee's DNA sample" represents a "second intrusion" which is a greater intrusion on the arrestee's privacy. (*Buza, supra*, 4 Cal.5th at p. 720 (dis. opn. of Cuéllar, J.).)[19] However, as we have noted, *King* and *Buza* recognized the identification process includes both the taking and analysis of an arrestee's DNA and the governmental interest attaches when the arrestee is taken into custody on an arrest supported by probable cause. (*King, supra*, 569 U.S. at pp. 449-450, 465, 466; *Buza*, at p. 677.) Noting that the *King* court "treat[ed] . . . the taking and analyzing as part of a single 'identification' process, rather than two independent

---

[19] We note that it is not the physical sample that is stored and compared; it is the profile determined from the analysis that is stored in the DNA databank and compared to other profiles. (*Buza, supra*, 4 Cal.5th at pp. 666-667.)

searches," the district court in *Haskell II* found this to be significant in finding the DNA Act constitutional as applied to arrestees for whom formal charges are not filed. (*Haskell, supra*, 317 F.Supp.3d at p. 1101.)  We conclude the same as to our state charter.

We conclude defendant's contentions that the DNA Act applied to him violated article I, section 13, of the California Constitution are without merit.  Defendant's contentions either were disposed of by the *King, Buza* and *Haskell* courts, or do not sufficiently affect the applicable constitutional balancing analysis so as to render the DNA Act unconstitutional under our state charter.

### 3. California Constitutional Right to Privacy

In the trial court and, for the first time on appeal, in his supplemental reply brief,[20] defendant asserts the DNA Act violates his right to privacy under article I, section 1, of the California Constitution because that provision contains a "more potent privacy interest" related to informational privacy.[21]

Article I, section 1 of the California Constitution provides:  "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*."  (Italics added.)  The words "and privacy" were added to our state charter by ballot initiative approved by the electorate in 1972.

---

[20]  After defendant did not object, we granted the People's request to file a supplemental surreply brief to address the issue.

[21]  Our high court defines the informational privacy interest as an interest "in precluding the dissemination or misuse of sensitive and confidential information."  (*Hill v. National Collegiate Athletic Association* (1994) 7 Cal.4th 1, 35 (*Hill*).)  "Informational privacy is the core value furthered by the Privacy Initiative" (*ibid*), which added the right to privacy to our state constitution.  "A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity.  Such norms create a threshold reasonable expectation of privacy in the data at issue." (*Ibid.*)

(*Hill, supra*, 7 Cal.4th at p. 15.)  "The principal ' "mischiefs" ' that the Privacy Initiative addressed were: '(1) "government snooping" and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records.' " (*Lewis v. Superior Court* (2017) 3 Cal.5th 561, 569 (*Lewis*).)

Our high court has repeatedly stated, in the context of search and seizure, that the privacy protected by Article I, section 1 of the California Constitution is no broader than the privacy protected by the Fourth Amendment or by article I, section 13 of the California Constitution.  (*In re York* (1995) 9 Cal.4th 1133, 1149 (*York*); *Hill*, *supra*, 7 Cal.4th at p. 30, fn. 9; *People v. Crowson* (1983) 33 Cal.3d 623, 629 (*Crowson*), overruled on another ground in *People v. Myers* (1993) 5 Cal.4th 1193, 1195, 1201, as stated in *People v. Carter* (2005) 36 Cal.4th 1114, 1144; see also *Smith v. Los Angeles County Board of Supervisors* (2002) 104 Cal.App.4th 1104, 1124 (*Smith*); *People v. Elwood* (1998) 199 Cal.App.3d 1365, 1371-1372 (*Elwood*).)  Rather, the federal and state search and seizure rights and the state privacy rights are coextensive with each other. (*Crowson*, at p. 629.)  We are bound by our high court's determination on this point. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[22]

---

[22]  The People argue that even if the right to privacy is not coextensive with search and seizure rights, defendant has not established that his right to privacy has been violated, citing the elements for privacy rights violations established by our high court in *Hill*:  (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct constituting a serious invasion of the privacy interest. (*Lewis*, *supra*, 3 Cal.5th at p. 571; *Hill*, *supra*, 7 Cal.4th at pp. 39-40.)  Given our Supreme Court's pronouncement that in the search and seizure context the constitutional search and seizure rights are coextensive with the constitutional privacy right and the

Accordingly, we must apply the same balancing analysis we have applied concerning the federal and state search and seizure protections. Applying that analysis, we reject defendant's state constitutional privacy claim.

### 4. Proposition 8

Even if we were to conclude defendant's state search and seizure or privacy rights were violated, exclusion is not an available remedy. As noted, the Truth-in-Evidence provision of Proposition 8 eliminated the remedy of exclusion of evidence for violations of the California Constitution, "except to the extent that exclusion remains federally compelled." (*Lance W., supra*, 37 Cal.3d at pp. 886-887.) "[I]n California criminal proceedings, issues related to the suppression of evidence seized by police are, in effect, *governed by federal constitutional standards*." (*Buza*, *supra*, 4 Cal.5th at p. 685, italics added; accord, *Redd, supra,* 48 Cal.4th 691, 720, fn. 11; *Robinson, supra,* 47 Cal.4th at p. 1119; *Banks, supra,* 6 Cal.4th at p. 934; *Elwood*, *supra*, 199 Cal.App.3d at pp. 1371-1372.)

Defendant argues that, while the *Buza* court recognized the Truth-in-Evidence provision, it nevertheless addressed the state constitutional grounds asserted by the defendant, noting the independent force of our state charter. This is true because *Buza* addressed the substantive scope of California's Constitutional provision. *Buza* was not an evidence suppression case and our high court was careful to note that Proposition 8's Truth-in-Evidence provision must apply in such cases. (*Buza*, *supra*, 4 Cal.5th at p. 685.)

Defendant asserts that Proposition 8 does not apply to his state search and seizure or informational privacy claims because *King* did not address the collection and analysis of DNA from an arrestee when the prosecutor later declines to file formal charges and it did not decide the Fourth Amendment issue "within the context of" his informational

---

application of the Truth-in-Evidence provision in Proposition 8, which we discuss *post*, we need not separately analyze defendant's privacy right contention under the *Hill* test.

57

privacy contention.[23]  But we look to the "federal constitutional standards" in determining the scope of Proposition 8.  (*Buza, supra*, 4 Cal.5th at p. 685.)  On this point, we once again note that our high court in *Buza* twice identified as the *holding* in *King*:  " '[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.' "  (*Id*. at pp. 664, 673, quoting *King, supra*, 569 U.S. 465-466.)  And as we have observed, the high court's holding was intentionally broad and apparently intended to cover more than Maryland's DNA database law.

Regarding defendant's informational privacy claim grounded on our state's constitutional right to privacy, we have already noted that our high court has on more than one occasion held the privacy right under article I, section 1 is no broader than the privacy protected by the Fourth Amendment or by article I, section 13 of the California Constitution.  (*York, supra,* 9 Cal.4th at p. 1149; *Hill*, *supra*, 7 Cal.4th at p. 30, fn. 9; *Crowson, supra,* 33 Cal.3d at p. 629; *Smith, supra,* 104 Cal.App.4th at p. 1124; *Elwood,*

---

[23]  We note that the Truth-in-Evidence provision of Proposition 8, enacted by the electorate in 1982 is a more recent and more specific constitutional provision than the Privacy Initiative, enacted in 1972, so the privacy right does not trump Proposition 8. (Cf. *People v. Adelmann* (2018) 4 Cal.5th 1071, 1079 ["On the question of venue, Proposition 47 is both more recent and more specific than the probation transfer statute"; the focused language of section 1170.18, added by Proposition 47, controls over the more general provisions of section 1203.9]; *In re David T.* (2017) 13 Cal.App.5th 866, 872 [" ' "more recent and specific intent underlying Proposition 21's amendments to section 781 prevail[s] over th[e] general intent" recognized when the statute was initially enacted' "]; *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493, 1511 ["if push came to shove and article X, section 2 really were in irreconcilable conflict with article XIII D, section 6, subdivision (b)(3), we might have to read article XIII D, section 6, subdivision (b)(3) to have carved out an *exception* to article X, section 2, since Proposition 218 is both more recent and more specific"].)

*supra,* 199 Cal.App.3d at pp. 1371-1372 [applying Proposition 8 in the context of a challenge grounded on article I, section 13 and article I, section 1].)  Indeed, in *People v. Guzman* (2019) 8 Cal.5th 673, our high court recently rejected an argument that the right to privacy "outranks" the right to truth-in-evidence under Proposition 8.  (*Guzman,* at p. 683.)  There, our high court concluded that the Truth-in-Evidence provision abrogated the exclusionary remedy in section 632, subdivision (d).[24]  Our high court held: "Proposition 8 can eliminate the exclusionary remedy without affecting the 'substantive scope' of article I, section 13.  [Citation.]  In much the same way, Proposition 8 can eliminate the exclusionary remedy of  section 632(d) *without affecting the substantive scope of privacy of article I, section 1 . . . .*"  (*Guzman*, at p. 684, italics added.)

We follow our high court's lead here and conclude that, even if there was a violation of defendant's substantive rights under either article I, section 13 or article I, section 1, exclusion of evidence is not available as a remedy in a criminal proceeding.

**5.  Conclusion**

We note here, as did our high court in *Buza*, that " 'it is our solemn duty to jealously guard' the initiative power secured by the California Constitution, and that we accordingly may not strike down voter measures 'unless their unconstitutionality clearly, positively, and unmistakably appears.' "  (*Buza, supra*, 4 Cal.5th at p. 694, quoting *Legislature v. Eu* (1991) 54 Cal.3d 492, 501.)  Here, two separate initiatives are in play, Proposition 69 and Proposition 8.  The voters have spoken twice.  As our foregoing analysis makes clear, we do not find any unconstitutionality clearly, positively, and unmistakably appearing in the DNA Act or in its application to defendant here.

---

[24]  Section 632, subdivision (a) prohibits nonconsensual recording of confidential communications.  Subdivision (d) of section 632 provides in pertinent part:  "[E]vidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding."

Accordingly, we conclude that the DNA Act, as applied to defendant,[25] did not violate his search and seizure rights under the Fourth Amendment or under article I or section 13, of the California Constitution.[26] Nor did the DNA Act as applied to defendant violate his right to privacy under article I, section 1 of the California Constitution. We further conclude that even if his state constitutional rights were violated, the Truth-in-Evidence provision of Proposition 8 bars exclusion of the DNA evidence.

## II. Additional Background Facts Pertinent to the Remaining Contentions

As noted *ante*, defendant mounted a third party culpability defense, asserting that S.L. and/or Christopher, were responsible for Jessica's death. During the early stages of the investigation, Jessica's mother told a Sheriff's detective that Jessica started having problems at home and running away after she met S.L. The detective immediately started looking for S.L.

### A. Defense Evidence

S.L. was called as a witness by the defense.[27] She was fourteen at the time of Jessica's death and "really good friends" with her. The two of them attended the same

---

[25] To the extent defendant asserts a strictly facial challenge to the DNA Act, we would find that challenge meritless under *King* and *Buza*.

[26] In light of our determinations here, we do not address the People's contentions that defendant cannot challenge the state's analysis of his DNA because he acquiesced to it, and that if the DNA Act is unconstitutional, the good faith exception to the exclusionary rule should apply.

[27] At an Evidence Code section 402 hearing outside the presence of the jury during the defense case-in-chief, S.L. took the stand and invoked her Fifth Amendment right against self-incrimination on the advice of appointed counsel. Subsequently, the prosecution moved pursuant to section 1324 for the trial court to grant S.L. use immunity for her testimony in this case. The trial court granted the prosecution's request.

middle school, which was located adjacent to the park. Jessica did not have many friends. According to S.L., Jessica was shy and naïve, and looked up to S.L.

In the weeks preceding her death, Jessica had begun running away because she was experiencing problems at home, and she would seek out S.L. S.L.'s mother, Christina L., would let S.L. and Jessica stay in her motel room at Vince's Motel. Vince's Motel was patronized by drug users and prostitutes, as was the motel next door, Casa Linda, where Christina also stayed on occasion. When Christina was not around, S.L. would turn to others at the motel to take her in and care for her, including Connie K., Michelle S., and Christopher.[28]

Connie testified that Jessica was "always in tow with" S.L., and that Jessica looked up to S.L. Connie also testified "[S.L.] was very jealous of [Jessica]. She was jealous to the point she almost couldn't hold back her feelings. She often didn't, really."

On the Thursday before Jessica was killed, she had run away and contacted S.L. S.L. took Christopher and went to look for her. S.L. testified that Christopher knew Jessica from when Jessica had been at Vince's Motel.

S.L. testified she did not recall ever having any fights with Jessica, and did not have any issues with Jessica in the days leading to her death. But S.L. acknowledged leaving voicemails for Jessica prior to her death in which S.L. was "upset a little." She first told detectives that the reason she had been upset was because Jessica had lied to her about something. She then told detectives that she had been upset because Jessica had gone to see Jessica's boyfriend in the park without S.L., and S.L. did not trust Jessica's boyfriend. This explanation, too, would prove to be false.

S.L. testified Jessica was going to be initiated into the Juggalos, a gang that follows the music group Insane Clown Posse. According to S.L., there are two different

---

[28] The trial court declared Christopher unavailable to testify after he asserted his Fifth Amendment right against self-incrimination.

types of Juggalos: those who are simply fans of Insane Clown Posse, and those who are members of the gang. S.L. testified that she was both and that she was a Juggalo gang member at the time of Jessica's death. Juggalos throw up hand signs of "W" and "C" which stands for "Wicked Clown." According to S.L., a hatchet is the "main symbol" of the Juggalos and a cartoon symbol of a running person carrying a hatchet is a symbol of the gang. The leader of a Juggalos gang metaphorically "carr[ies] the hatchet," and they also actually have physical possession of a hatchet "in their room. They don't take it out in public." Locally, the Juggalos hung out every day in the gazebo at the park, which was close to the dugout where Jessica's body was discovered.

According to S.L., Jessica was to be initiated into the Juggalos at the park on the Friday prior to her death, but Jessica did not show up. The initiation was rescheduled for Sunday. Thus, contrary to her earlier claim about a voicemail she had left Jessica, S.L. testified that it had not been Jessica's plan to meet her boyfriend in the park on that Sunday, March 4, 2012, but rather Jessica was to be initiated into the Juggalos that day. S.L. did not want Jessica to be initiated into the Juggalos.

The last time S.L. saw Jessica alive was on Monday, March 5, 2012, at 7:00 a.m. at a light rail station. Jessica was with her mother and was on the way to school. S.L. did not go to school that day. Instead, S.L. was at her friend Shawn D.'s house that day.

S.L. testified that, at approximately 7:15 p.m. on Monday, March 5, 2012, she called Connie attempting to get in touch with Christina who did not have a phone. There was conflicting testimony about what S.L. said during this call, and defendant asserts what was said establishes S.L.'s culpability for the murder.

According to S.L., Connie answered and handed the phone to Christina, but Christina did not want to talk to S.L. and passed the phone to Christopher. Christopher asked S.L. when she would be home and S.L. replied 9:30 or 10:00 p.m. S.L. left Shawn's house after the phone call, but later returned and stayed there until 11:40 p.m.

She then returned to Vince's Motel, went to Christina's room, and went to sleep. S.L. did not recall seeing Christopher at Vince's Motel that night.

Regarding the phone call, Connie testified that, around dusk, she was walking to the store with Christina and Christopher when S.L. called and asked for Christina. Connie handed her phone to Christina, who said to S.L., " 'What the fuck do you want? Leave me the fuck alone.' " Christina then handed the phone to Christopher. Connie testified she could hear S.L. screaming over the phone, " 'Could you tell my mom please, please?' " " 'Can you come right now? I need your help,' " and " 'Come right now.' " After testifying S.L. did not say anything else, in response to a leading question by defense counsel, Connie testified she also heard S.L. say, " 'I can't do this alone.' "[29] Connie estimated the telephone conversation lasted approximately 40 minutes.

According to Connie, at some point, Christopher asked Christina, "Should I go to the park and get the girls?" Christina then asked Connie whether she could borrow a blanket. From what Connie understood, Christopher planned to pick up the girls in the park at 9:00 p.m. Christopher borrowed a blanket from Connie. She thought they needed the blanket because the girls were going to sleep over. However, she thought it was odd that Christopher took the blanket before going to the park rather than simply getting it when he came back with the girls. Connie testified she saw S.L. at approximately 11:00 p.m. that night coming out of one motel room and going into Michelle's room.

Early the next morning, Christopher came to Connie's room, gave her the blanket, said, " 'I gotta get the fuck out of here,' " and left. Connie characterized Christopher as frantic, scared, panicked, and in a hurry. He was wearing the same clothes he had been wearing the night before. The blanket did not appear to be the same blanket she had

---

[29] S.L. testified that, during the phone call, she did not tell Christopher " 'I'm at the park. I can't do this alone.' " She also testified Christopher never said he would come meet her.

63

given him the night before. It was a different color and it was clean, whereas the one she had given him was not.

Michelle testified that, one night, at approximately 10:00 or 11:00 p.m., S.L. came by and then left to meet some friends. She returned later that night or in the very early morning hours the next morning, perhaps at 1:00 or 2:00 a.m. At 7:00 or 8:00 a.m., Christina and her boyfriend came into the room and said a little girl had been found dead in the field at the school. According to Michelle, S.L., who had been sleeping on the couch, jumped up and said, " 'Oh, my God,' " and then said, while crying, " 'I just beat her up.' " According to Michelle, S.L. repeated these words a few times. Christina and her boyfriend had not mentioned Jessica's name, and Michelle wondered how S.L. knew the identity of the girl found dead at the school. Christina responded to S.L. by saying " 'Don't worry about it. We'll figure this out.' " Then S.L., Christina, and Christina's boyfriend left. That morning, Michelle noticed that the knife she "shove[d] in the corner" of her bathroom door to keep it closed was gone. It had been there the night before.

Suzanne S. testified that she lived close to the park and Christopher previously had been her neighbor. He occasionally visited. Sometime between 7:00 and 10:00 a.m. on the morning Jessica was found dead, Christopher stopped by to use Suzanne's phone to call his brother. Christopher then waited for his brother to come get him. While waiting, he was not talkative as normal and had a blank look on his face. He looked fatigued and "like he just came from sleeping out in the bushes or something." His hair was "messed up." He had his backpack with him, as he always did.

Michelle testified that, approximately two weeks after Jessica was killed, she heard S.L. say, about Christina, " 'Fucking bitch is telling on me. I know she is.' " Michelle believed Christina had been called in to speak with police multiple times.

S.L. acknowledged knowing, prior to Sunday, March 11, 2012, when she was interviewed by the police, that the police suspected the Juggalos gang was involved in Jessica's death, and she also knew that she had been under suspicion.

64

On cross-examination by the prosecution, S.L. testified that she did not kill Jessica, she was not there when Jessica was killed, she did not orchestrate the killing, and she did not know beforehand that the murder was going to take place. She was not with Jessica on the night she was killed. S.L. testified she never beat up Jessica, and was not angry enough to do so. She also denied saying, when she first learned of Jessica's death, "All I did was beat her up."

Detective Kevin Reali testified that, on Friday, March 9, 2012, he arrested Christopher on a felony drug warrant. Reali found a knife on the mattress on which Christopher was lying, and Christopher had another knife in his pocket. One had a fixed, non-serrated blade and a black handle with black electrical tape around it. A knife with a handle wrapped in black electrical tape was found in Christopher's backpack. Reali also identified several knives which were seized during a search of defendant's residence. All of these knives were tested and Jessica's DNA was not found on any of them.

## B. The Prosecution's Rebuttal Case

Detective Sergeant Paul Belli testified that, on March 7, 2012, Lora D., the mother of S.L.'s friend Shawn, told him that S.L. had stayed at her house all day Saturday and Sunday, and that, when Lora woke up on Monday, at approximately 3:30 a.m., S.L. was still there. Lora told Belli that she was fairly certain that S.L. stayed at her house all day Monday until approximately 11:00 p.m. S.L. returned to Lora's house at 10:00 or 11:00 a.m. on Tuesday, and was there until approximately 4:00 p.m.

A clip from a surveillance video from Vince's Motel, recorded at 12:03 a.m. on March 6, 2012, was played for the jury. In the clip, a subject wearing a dark jacket and dark pants can be seen walking up a flight of stairs and past room 225. S.L. said that it could be her, and Michelle said that it was S.L.

Belli testified that he interviewed Connie and she never told him she had heard S.L.'s side of a telephone conversation between S.L. and Christopher. Connie also never told Belli that S.L. sounded upset during that phone call. And Connie never told Belli

65

she heard S.L. say, " 'I can't do this by myself,' " or " 'I'm at the park,' " during that telephone conversation. Connie also never told Belli that the blanket Christopher returned to her was not the same blanket as the one she had given him the day before; nor did she tell Belli that, when Christopher returned the blanket, he was in a panic, was visibly upset, or said, " 'I got to get the fuck out of here.' " Belli testified that, when he looked at Connie's telephone's call log, he saw that the phone call between S.L. and Christopher lasted approximately two or three minutes, in contrast to Connie's testimony that the conversation lasted approximately 40 minutes.

Megan Wood testified in rebuttal that, in examining the cigarette butts, S.L. and Christopher were both excluded as DNA contributors. They were also both excluded as contributors to the DNA evidence found on Jessica's belt.

### III. Defense Gang Expert Testimony

### A. Additional Background

### 1. Defendant's Motion

In his in limine motions, defendant sought to admit expert testimony regarding the Juggalos gang, but abandoned the motion prior to trial.[30] Later during the trial, the defense renewed its motion after receiving interviews from Connie and Michelle and the report of its forensic pathology expert, Dr. Curtis Rollins. Defendant emphasized S.L's affiliation with the Juggalos and that Jessica had been scheduled for initiation into the Juggalos on the weekend immediately preceding her death, but she failed to show up for the initiation. Defendant further asserted that detectives obtained information during the investigation that several Juggalos were in the park on the night of the murder. He argued that law enforcement was focused on S.L. and the Juggalos before obtaining the

---

[30] Regarding the abandonment of the motion, counsel told the court, "we don't think [S.L.] was involved, this would no longer be applicable." Counsel also told the court she did not intend to introduce evidence regarding the Juggalos.

DNA results. He argued that S.L. was tied to the murder by Michelle's statement that S.L. had said she only "beat up" Jessica, Connie's statement that S.L. asked Christopher to help her, and S.L.'s Facebook posts indicating the depth to which she was involved in the Juggalos. Defendant asserted that he had a federal constitutional right to present a defense and Proposition 8's Truth-in-Evidence provision entitled him to present all relevant evidence.

## 2. Evidence Code Section 402 Hearing – S.L.'s Testimony

The court indicated it "needed to see some evidence and foundation" on the matter. After S.L. was granted immunity, the court held an Evidence Code section 402 hearing where she provided testimony. Among other things, she testified she was a Juggalo gang member, acknowledged that certain friends and relatives were Juggalo gang members, and testified that she knew "a lot" of people who were Juggalos.

After the hearing, the trial court stated that the defense still needed to establish a connection between S.L.'s gang affiliation and the killing of Jessica. Defense counsel asked the court to consider the testimony of its forensic pathologist expert, Dr. Rollins, scheduled for the following day. The defense proffered that the gang expert would testify that "asphyxiation, coupled with throat stabbing, is the primary activity of the Juggalos street gang." The trial court reserved on the issue.

## 3. Defense Forensic Pathology Expert Trial Testimony

Dr. Rollins had training as a physician and pathologist, doctor of dental science, and as a police officer. He reviewed Dr. Reiber's autopsy report and photographs, including the autopsy photos. He testified that Jessica sustained three injuries which could have caused her death.

The first of these injuries was asphyxia. In Rollins's opinion, this was the "initiating event." Rollins testified that either someone sat on Jessica's chest with sufficient force to prevent her from breathing, or someone constricted her neck with a very soft ligature which would not leave a mark. Rollins noted the presence of petechiae,

or bruising that arises in the case of asphyxia that "pop out all over the face, the eyes, the lips, and anywhere above the point of pressure," from the jaw line or neck up. He believed that, because it is generally expected that the petechiae will appear from the place where the traumatic pressure occurred and upward, the site of the pressure causing Jessica's asphyxia was at the neck rather than the chest. Rollins also noted there were two or three distinct, nondescript bruises on Jessica's neck. He testified that a soft ligature could have left these bruises, particularly "if [Jessica] is trying to remove it or get her fingers around it to get relief." Thus, the presence of bruising on Jessica's neck did not mean a soft ligature was not used; rather, it could indicate that Jessica was struggling to take it off.

The second potentially fatal injury was the knife wound to the neck severing the carotid artery. Rollins opined that this wound "definitely" occurred after the asphyxiation. According to Rollins, at the time Jessica's carotid artery was cut, she had insufficient blood pressure to create arterial spurt, which explained the absence of arterial spurt at the scene. Therefore, this wound must have occurred after the asphyxia. He further opined that it was not possible that this stab wound was inflicted simultaneously with the asphyxia. According to Rollins, there would have been more spurting because the blood pressure would be higher if this stab wound was inflicted at the same time as the asphyxia.

The third potentially fatal injury was the skull fracture with internal bleeding of the brain. Rollins's opinion, based on "very little bleeding" associated with the skull fracture, was that this wound also occurred after the asphyxia. Rollins testified that, given the facts at issue, there were two ways Jessica could have sustained the skull fracture: either "she was standing, and forcibly struck the back of her head against the wall, or she was lying on her back, picked up by her shoulders at the waist level and slammed back onto the floor." Rollins opined that the latter scenario was more likely.

According to Rollins, had Jessica been standing, she would have sustained a whiplash-type injury and thus injury to her neck.

Regarding the small knife wound to the back of Jessica's neck, Rollins opined that it was inflicted postmortem. Rollins testified that the wound did not have any color or redness to it, "which means no heart was beating, no blood going to that area."

### 4. Tentative Ruling

The court indicated it had reached a tentative ruling that the gang expert's testimony would be admitted. Thereafter, the prosecution requested an Evidence Code section 402 hearing with the gang expert, emphasizing that there had not been any Juggalo homicides in Sacramento. The prosecutor questioned what facts the expert would rely on in concluding that this was a Juggalo homicide, or a homicide made to look like a Juggalo homicide.

Defense counsel replied that the pathologists disagreed, and that the defense pathologist concluded that certain wounds were postmortem, which would be consistent with a Juggalo murder involving "overkill."

The trial court tentatively decided that the gang expert could testify "as to issues that are specifically relevant to this case," but, although he could testify about the characteristics of Juggalo murders, he would not be permitted to testify that, in his opinion, this was a Juggalo killing. The court noted, essentially, that its ruling could change based on the expert's testimony at an Evidence Code section 402 hearing. The court added, "[t]here is a foundational issue of whether he can testify at all."

### 5. Evidence Code section 402 Hearing – Gang Expert

The proposed defense gang expert was Sacramento Sheriff's Detective Kenny Shelton. Shelton was a detective in the gang suppression unit, and the prosecutor stipulated to his expertise on the Juggalo gang.

Shelton testified that the Juggalos are "a group of social outcasts." They do not consider themselves a gang, they consider themselves a family. He testified that "a

69

Juggalo is a follower of . . . the horrorcore brand music, primarily the Insane Clown Posse." The lyrics of their music "focused primarily in two areas, one being violence, and the other being sort of a quasi religion." Shelton characterized the music as "ultraviolent."

Shelton estimated there were approximately 40 documented Juggalos in Sacramento, the majority of which were males. He had "seen numerous Juggalos in Rosemont," and had contacted Juggalos there in the past.

Defense counsel asked Shelton if he had seen Juggalo "stabbings or threatening to stab" in Sacramento, and Shelton responded: "Within Sacramento, typically we don't see it. [¶] A lot of our Sacramento Juggalos are kind of more transient. We have had violent crimes committed by them. I want to say there was one of the type that you reference, but I couldn't begin to give you details." However, Shelton testified he was aware of no Sacramento homicides "motivated by some sort of Juggalo desire to commit crime," and he had never investigated a murder in Sacramento County connected to a Juggalo.

Shelton had studied murders committed by Juggalos outside of Sacramento County. He had studied "[d]ozens. A couple dozen" such attacks, "primarily in the Stockton-Modesto area." And he talked to investigators involved in the Stockton and Modesto murders. Additionally, he had researched such attacks in the Midwest, in Illinois, and in Michigan. Based on his research, such murders were exemplified by: (1) chopping, hacking, or stabbing attacks, and (2) "overkill," including infliction of wounds postmortem, or "just excessively assaulting with a chopping or hacking instrument long after they are dead." He explained, "a lot of that is going back to the ultimate violent message within the music." When asked whether what he meant by "overkill" was "multiple stabs, multiple hacks," Shelton responded, "yes" and testified he had not heard of a Juggalo killing involving "a single stab." The Juggalo assaults are typically targeted from the torso, up. Sometimes stabbing in the head and neck is accompanied by

70

asphyxiation, but there is "no direct correlation" with asphyxiation.  Shelton was not asked what the motives were for any of the killings he had researched.

In opining whether a homicide is Juggalo related, Shelton testified he would look to the typical things he would look for in any gang crime:  "[T]he individuals involved.  Members with the Juggalos.  The type of killing would lead me to . . . focus in that direction."

He testified that he could validate Juggalo gang membership based on S.L.'s Facebook posts which showed her with a painted clown face and throwing Juggalo gang signs, texting they "bang" Juggalo, admission of association with other Juggalos, and understanding the difference between being a follower of Insane Clown Posse music and a being a gang member.

He testified that initiation into the Juggalos does not involve killing.  Nor does it "entail the extremes that a traditional gang would."

On cross-examination, Shelton stated that he had not seen the crime scene photographs of Jessica in this case.  Nor had he been asked any hypotheticals related to the facts in this case.

After Shelton's testimony, the court asked for clarification on the scope of the proposed trial testimony.  Defense counsel explained she wanted Shelton to testify to (1) what it means to be a Juggalo, (2) "the role of knives or stabbing instruments" in Juggalo homicides, and (3) "primarily the role of overkill or postmortem injuries."

The prosecutor objected to the testimony on Evidence Code section 352 grounds, asserting that the relevance would be outweighed by the "enormous waste of time for the jury to go into these areas."  The prosecutor also emphasized that Shelton had not been provided with any information concerning this case, and was not asked any hypothetical questions based on the facts of this case.  Further, the prosecutor emphasized that Shelton's knowledge was not based on Sacramento homicides, but on homicides in other areas of California and other states.  And while Shelton testified that Juggalo killings

71

involve overkill, the prosecutor argued such was not the case here.  The prosecutor asserted that Shelton should only be permitted to testify so as to place the other testimony concerning Juggalos in context and no further.

Defense counsel argued that failing to give full context to the evidence before the jury concerning Juggalos would not make sense.  The fact that Juggalos carry knives gives S.L. "motive and opportunity."  Counsel argued the stab wound to the carotid was inflicted "right at death or right before death."  Counsel suggested there was no reason to inflict that wound and it is an example of overkill.  Counsel also argued that the fact there were three causes of death indicates overkill, and "is characteristic of the Juggalo gang."

The trial court ruled that it would allow Shelton to testify to define what a Juggalo is in general.  However, under Evidence Code section 352, the trial court refused to allow Shelton to "go into the murder in this particular case.  He doesn't have any information about it.  He has never investigated a murder himself attributed to a Juggalo, at least in Sacramento County.  He has read and studied about it, but given the fact that he has no hands-on experience, and given the fact that he isn't going to be able to offer anything relative to this case, *under 352 it's going to be an undue consumption of time*.  It doesn't assist the jury in their ultimate responsibility here.  So that's the Court's ruling."  (Italics added.)

Defense counsel advised the court she did not provide case materials to Sheldon for review because the trial court tentatively indicated it would not allow him to give an opinion about whether Jessica's murder was a Juggalo killing.  Counsel further advised she could pose a hypothetical which did not require review of case materials.  However, counsel did not ask to reopen the Evidence Code section 402 hearing to allow her to do so.  Instead, counsel announced she was disinclined to call Shelton as a witness, given the court's ruling.  Ultimately, Shelton did not testify.

**B. Applicable Legal Principles and Defendant's Contentions**

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.  Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert."  (Evid. Code, § 720, subd. (a).)  "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:  [¶]  (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶]  (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  (Evid. Code, § 801, subd. (b).)

" 'The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.]  " 'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility.' " ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 536, (*Nelson*) quoting *People v. Bolin* (1998) 18 Cal.4th 297, 321-322 (*Bolin*).)

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of [an Evidence Code section 352 counterweight] substantially outweighs probative value" and " 'a trial court's exercise of discretion will not be disturbed except on a showing the trial court exercised

73

its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

Defendant asserts that the trial court erred in excluding relevant defense evidence because Shelton was sufficiently qualified to give expert opinion evidence. Defendant further asserts that Shelton's testimony would have been relevant to his third party culpability theory. He contends it was error for the trial court to limit Shelton's proposed testimony to " 'what a Juggalo is in general' " merely because Shelton had not reviewed case materials and because he did not have " 'hands on' " experience investigating Juggalo homicides in Sacramento. He also asserts the evidence established motive and opportunity for S.L. to commit the murder, and, because the murder was consistent with overkill murders committed by Juggalos, the testimony provided a motive for the manner in which S.L. killed Jessica.[31] Defendant maintains that the trial court's error violated his state and federal constitutional rights to present a defense, to confront and cross-examine witnesses, to due process, and to a fundamentally fair trial.

We conclude the basis for the trial court's ruling was erroneous. We need not consider other reasons that could have supported preclusion of the testimony because we conclude any error was harmless.

---

[31] Defendant also argues for the first time in his reply brief that the Juggalo's "proclivity toward stabbing, cutting, and hacking victims was crucial to the jury's understanding of why, if [S.L.] was involved, she would engage in the type of assault she did to a person who was arguably her good friend." This theory of admissibility is forfeited for failure to assert it in the trial court. " '*A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct*.' " (*Holford*, *supra*, 203 Cal.App.4th at p. 169 [concluding defendant forfeited argument the trial court could have sanitized evidence based on his Evidence Code § 352 objection because defendant failed to suggest to the trial court a specific evidentiary alternative].)

74

## C. Analysis

As stated *ante*, "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) " 'The subject matter of the culture and habits of criminal street gangs . . . meets this criterion.' " (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 53, quoting *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*), disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665.) Given the prosecutor's stipulation, Shelton's qualifications and expertise were not at issue. The remaining, related issues were whether there was a sufficient foundation for Shelton's proposed testimony and whether that testimony would have been relevant.

We agree with defendant that Shelton's proposed testimony, beyond the mere definition of what a Juggalo is, had some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" and was thus relevant. (Evid. Code, § 210.) He could have testified about the general nature of Juggalo killings. In light of the evidence before the trial court establishing a connection between Jessica, S.L., and the Juggalo gang, and evidence that the Juggalos customarily congregated in the park, Dr. Rollins's testimony and Shelton's proposed testimony concerning the nature of Juggalo killings, Shelton's testimony could have some tendency in reason to prove defendant's theory of the case. (See Evid. Code, § 210.)

It is well established that gang culture and habits are matters about which a gang expert may testify. (*Gardeley*, *supra*, 14 Cal.4th at p. 617.) The source of such information might include "*conversations with gang members . . .* the expert's personal investigation of past crimes by gang members and *information about gangs learned from the expert's colleagues or from other law enforcement agencies*." (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9, italics added.) The basis for expert testimony could come from other sources as well, such as articles and publications on the subject. (Evid.

75

Code, § 801, subd. (b) [in forming their opinions, experts may rely on material of a type that is reasonably relied upon by experts in the particular field].) Hands on experience is not necessarily required. The absence of such experience goes to the weight, not the admissibility of the testimony. (*Nelson, supra,* 1 Cal.5th at p. 536; *Bolin, supra,* 18 Cal.4th at pp. 321-322.)

Yet, the trial court ruled the testimony inadmissible under Evidence Code section 352, finding that Shelton's testimony would result in an undue consumption of time because Shelton had no case-specific information, never himself investigated a Juggalo murder, had only read and studied about Juggalo murders, had "no hands-on experience," and was not going "offer anything relative to this case." Not only was Shelton qualified to testify about the nature of Juggalo murders, but presentation of evidence that goes to "the heart of the defense" generally does not represent an "undue" consumption of time. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)[32]

We conclude that the probative value of Shelton's testimony was not substantially outweighed by the probability that its admission would necessitate an undue consumption of time. As defendant notes, Shelton's Evidence Code section 402 testimony was not unduly time consuming, and there is little reason to believe that his trial testimony would

---

[32] On appeal, defendant asserts Shelton could have offered an opinion based on a hypothetical question. We agree that experts may offer such opinions. " ' "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.]" ' [Citation.] ' "Such a hypothetical question must be rooted in facts shown by the evidence . . . ." ' " (*People v. Ewing* (2016) 244 Cal.App.4th 359, 382, quoting *People v. Vang* (2011) 52 Cal.4th 1038, 1045, 1047, 1048.) Consequently, here it was theoretically possible Shelton could have offered an opinion to whether a hypothetical situation mirroring certain facts of this case was consistent with a Juggalo killing. However, defendant never posed such a question to Shelton during the Evidence Code section 402 hearing. Nor did he request to reopen the hearing to allow him to do so. Consequently, his contention on appeal as to this point is forfeited. Again, " '[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Holford*, *supra*, 203 Cal.App.4th at p. 169.)

have been significantly more involved. Moreover, in the context of this case, the number of witnesses, and the duration of trial, we conclude that Shelton's proposed testimony would not have consumed an undue amount of time. In light the relatively short amount of time Shelton's testimony would have taken, we conclude the probative value of the evidence here was not substantially outweighed by the danger that such evidence would have been unduly time consuming or, for that matter, by the substantial danger of any other Evidence Code section 352 counterweight.

Based on the foregoing, we agree with defendant that the trial court abused its discretion in limiting Shelton's proposed testimony solely to defining what a Juggalo is.

### D. Prejudice

Asserting that the trial court's ruling violated his rights under the federal and California Constitutions to present a defense, to confront and cross-examine witnesses, to due process, and to a fair trial, defendant asserts that prejudice must be evaluated under the standard for federal constitutional error established in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*). Under *Chapman*, " '[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) However, *Chapman* applies in the context of state evidentiary error only when the error completely deprives a defendant of a " 'meaningful opportunity to present a complete defense.' " (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1071-1072, citing *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636].) And "[a]pplication of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense." (*People v. Snow* (2003) 30 Cal.4th 43, 90; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1450.) Here, defendant presented evidence supporting a third party culpability defense as to S.L., Christopher, and the Juggalos. Therefore, *Chapman* does not apply.

77

"We review errors in the application of the 'ordinary rules of evidence' such as Evidence Code section 352 under the standard set forth in" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 750.) Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Watson*, at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, *whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.*' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*), some italics added.)

Looking first at the evidence supporting a different outcome, we conclude it is weak relative to the evidence supporting defendant's guilt. We first note that, while the evidence is clear S.L. was a Juggalo gang member, defendant proffered no evidence establishing a gang-related motive for Jessica's murder. Nor was there any evidence whatsoever that Christopher was a Juggalo member or otherwise associated with the Juggalos.

Defendant argues that the manner of killing was consistent with overkill characteristic of Juggalo murders. There is no doubt that Jessica was brutally murdered, but she sustained no chopping or hacking injuries. She had only two stab wounds and only one was fatal.

Defendant bases his Juggalo murder theory on Dr. Rollins's testimony about the order in which the wounds were inflicted and his opinion about when they were inflicted relative to death. But evidence presented in the prosecution's case-in-chief and rebuttal severely undermined Rollins's testimony. Dr. Reiber, who actually performed the autopsy testified that he had done over 9,700 autopsies and testified over 600 times, in 30

78

different California counties. He testified that, in performing Jessica's autopsy, he considered whether asphyxia was caused by soft ligature. He concluded that there was no direct evidence to lead to that conclusion, whereas there were indicators consistent with chest compression asphyxia. Reiber emphasized that there was no sign of injury to Jessica's neck, externally *or internally*, that could have been caused by ligature. He testified that, if Jessica had been strangled with a soft ligature, he would have expected to have found injuries to the strap muscles that sit on top of the upper trachea and the voice box and he did not find any such internal injuries.

Regarding the petechial hemorrhaging purportedly limited to Jessica's face, Reiber testified that the face is most susceptible to petechial hemorrhaging regardless of where the compression occurs. He explained that, based on his experience of having performed hundreds of autopsies on strangulation victims, "facial petechial hemorrhages from a ligature strangulation are actually very unusual, because strangulation usually closes off the arteries as well as the veins." Regarding ligature strangulation, he explained: "If you do see the little pinpoint hemorrhages, most often you only see them in the lining of the eyelids and the whites of the eyes. You rarely will see very many on the face. You may get some, but it's not that common." Reiber also noted the small bruises on Jessica's shoulder blades, "which would be the kind of injuries that could result from her being basically pinned on the concrete slab of the dugout with someone sitting on her chest." Reiber also noted that there were, in fact, petechial hemorrhages on Jessica's neck.

Reiber testified that there was nothing about the bruises to Jessica's lower face and on the left side of her neck that suggested to him that they resulted from soft ligature. With regard to the bruises on the lower part of Jessica's jaw, Reiber testified that they were not consistent with soft ligature because they were bruises more than the abrasions Reiber would expect to see from a soft ligature event. Reiber believed that these bruises resulted from the attacker's hands and fingers "controlling [Jessica's] head to get it out of the way for the stabbing instrument to have access to the neck."

Reiber testified that the large stab wound to the neck was "very definitely a before-death injury." He emphasized that the "tissues that have been stabbed through are noticeably bloody," and that "[e]verything is reddened here." Reiber also testified that Jessica's substantial blood loss was consistent with a wound that was inflicted while she was alive.

Reiber "complete[ly] disagreed" with the premise that the blunt force trauma injury to the back of Jessica's head occurred postmortem. He emphasized that the outside of Jessica's scalp was bruised, the internal layer of her scalp was bruised, and there were several areas of subdural bleeding inside the skull. Additionally, there was " 'subarachnoid bleeding' around the rear of the left hemisphere of the brain, which . . . you absolutely do not see happening in an injury that is after death." There were several areas of bruising of the brain. Reiber testified that "[y]ou don't get bruising of the brain after death, so the head injury is absolutely, no question about it, prior to death. And potentially it could have been the first injury that occurred in the sequence of events."

Reiber testified that the evidence did not support the hypothetical that Jessica was first strangled with a ligature, died or was close to death, and then sustained a head injury as the last injury sustained. If this was the case, according to Reiber, neither the stab wound nor the head wound would have resulted in so much blood loss.

Addressing what he believed to be the order in which the injuries were inflicted, Reiber testified: "most likely head injury first. She either falls or is taken down to the concrete slab of the dugout, and then someone is sitting on her chest. So the asphyxia mechanism is in play. It's in progress while the stab wound is occurring. [¶] I think those two overlap. In my timeline they would overlap. And based on the blood loss, I think that the stab wound is probably the most important in terms of causation of death. And the asphyxia and the head injury of course contributed -- the asphyxia probably significantly, based on how flushed her face was."

Regarding blood loss, Reiber, who had been to the scene, testified that there was blood pooling under both Jessica's head and neck. Regarding the lack of arterial spurting from the lethal stab wound to the neck, Reiber opined this could be due to the compression on the chest, which would decrease the amount of blood flow to the neck. Also, he noted that Jessica had on multiple layers of clothes that were over the wound and could have "dampened any potential arterial spurt."

Reiber "[c]ompletely disagree[d]" that the small stab wound to the back of Jessica's neck was inflicted postmortem. He characterized it as "clearly antemortem." Reiber relied on the fact that there was "obvious reddening of the edges. You can see very clearly that this wound is reddened." According to Reiber, a postmortem wound will be completely pale "because the person is dead, and the small nerves that cause those vessels to dilate aren't functioning anymore." Reiber testified there was "[n]o question about it."

Given the opinion of the person who actually performed the autopsy that there were no postmortem injuries, defendant's attempt to show this was a Juggalo overkill murder was significantly undermined.

Defendant also sought to show that Juggalos carry knives by Shelton's testimony. Shelton testified in the Evidence Code section 402 hearing that Juggalo weapons include "large chopping, hacking, or stabbing instrument[s], . . . machetes, axes, hatchets, large knives. These are predominately the weapons that they carry *when they carry them*." (Italics added.) Shelton never testified all Juggalo gang members carry such instruments. Consequently, his testimony did not go very far in establishing S.L. had the "opportunity" to commit the murder as a knife-carrying Juggalo. Moreover, the evidence clearly established that defendant habitually carried knives, so Shelton's testimony would not have been materially helpful on the point defendant sought to make about S.L.

Connie and Michelle made prior statements materially inconsistent with their trial testimony. Connie did not tell the detective who interviewed her that she had heard

81

S.L.'s side of the telephone conversation with Christopher, that S.L. sounded upset during that phone call, or that she heard S.L. say, " 'I can't do this by myself,' " or " 'I'm at the park,' " during that telephone conversation. Nor did she tell him that the blanket Christopher returned was not the same blanket she gave him the day before or that, when he returned the blanket, he was in a panic, was visibly upset, or said, " 'I got to get the fuck out of here.' " She claimed the phone call was 40 minutes long, when her phone log showed it was two to three minutes in duration. Regarding the blanket that was purportedly not returned, there was no physical evidence at the crime scene indicating a blanket was used for anything. Surveillance video from Vince's Motel showed a male, identified as Christopher, walking east from the area of one part of the motel to another at 8:16 p.m. on March 5, 2012, and walking west from one area of the motel to another at 10:20 a.m. the following morning. In both instances, he carried a bundle under his left arm. S.L. identified the person in the latter clip as Christopher. Our independent viewing of the video clips reveals that the individual in the latter clip does not appear in a hurry and does not appear outwardly frantic or agitated. A district attorney investigator testified that no one matching that person's description can be seen leaving the property of Vince's Motel carrying a bundle similar to what is seen in the those clips between those times.

As for Michelle, she never told the police S.L. said she had "only beat her up." Both Connie and Michelle were methamphetamine users.

S.L. did not have a phone so she could not have called from the park. S.L. testified she called from Shawn's phone and Connie's phone indicated the call came from Shawn's phone. From this, a reasonable jury could infer S.L. was not at the park when she made the call.

A detective testified that Shawn's mother Lora, after originally being untruthful, reached out to him and told him that S.L. was at her house until approximately 11:00 p.m. that night. Connie testified that she saw S.L. at Vince's Motel at approximately 11:00

p.m.  The distance between Lora's house and the motel is approximately a fifteen-minute walk.  Surveillance video captured S.L. at Vince's Motel at 12:03 a.m. on March 6, 2012.

S.L. and Christopher were both excluded as DNA contributors regarding the cigarette butts.  Importantly, they were also both excluded as contributors to the DNA evidence found on Jessica's belt.

Turning now to the evidence supporting the judgment, we conclude it was indeed strong.  Defendant and his friend J.M. talked to Jessica at the park that evening, so defendant knew she was there alone.  M.K. testified that defendant showed J.M. a folding knife while they were at the park.  J.M. and his kids left the park when it was getting dark according to J.M., or at 7:00 or 8:00 p.m. according to M.K.  Defendant left at the same time, but by a different route.  Jessica remained where she was on the swings.  Between 8:00 and 9:00 p.m., two residents who lived near the park heard an unusual scream coming from the park.

Jessica's body was discovered in a dugout in the park the following morning.  A number of Camel cigarette butts located inside and in the immediate area of the dugout were consistent with a pack of Camel cigarettes near Jessica.  One cigarette butt contained DNA consistent with Jessica's DNA.  Two cigarette butts contained DNA consistent with defendant's DNA and inconsistent with Jessica's.  At least five cigarette butts contained a mixture of DNA consistent with Jessica's and defendant's DNA profiles, albeit to varying degrees of likelihood.  Contrary to defendant's statement to the detectives that he was known for smoking "refi's," J.M. and Salvador both testified that they never saw defendant pick up discarded cigarette butts and smoke them.  And a mixture of DNA was discovered on Jessica's belt buckle, with the major contributor profile consistent with Jessica's DNA profile and, based on six alleles, the minor contributor profile consistent with defendant's DNA profile.

Given the DNA evidence, it is clear defendant withheld information about spending additional time with Jessica when talking about the murder with his friends the

next day. Defendant did not disclose to J.M. or to Salvador that he had returned to the park after leaving when J.M. and his children left.

And despite the testimony of J.M. and his children showing that defendant met and conversed with Jessica in the park, and defendant's admission to Salvador that he had met Jessica, defendant repeatedly denied to detectives that he had ever met her. He also denied smoking cigarettes with Jessica or ever being in the dugout. Defendant even denied that he had been in the park. A jury could reasonably infer that these lies reflected consciousness of guilt.

In light of the foregoing evidence, we conclude it is not reasonably probable that, had the court not limited Shelton's testimony, defendant would have received a better result. Therefore, we conclude that the error in limiting his testimony was harmless. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant argues we should factor into our harmless error analysis the time it took the jury to arrive at a verdict. While we recognize that in some cases our Supreme Court has inferred a close case from unduly lengthy deliberations we decline to do so under the facts of this case. As the court reasoned in *People v. Walker* (1995) 31 Cal.App.4th 432, "[t]o do so in the absence of more concrete evidence would amount to sheer speculation on our part. Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Id*. at pp. 438-439.)

Indeed, that the jury here deliberated over six days[33] in a trial that involved 11 days of testimony from 50 witnesses and over 500 exhibits, including recorded interviews

---

[33] The parties state that the jury deliberated over 7 days. However, the jury commenced deliberations on Monday, September 14, 2015, deliberated daily through Friday, September 18, and rendered its verdict following additional deliberations early Monday afternoon, September 21.

84

and video surveillance recordings is not surprising. Moreover the six days of deliberations included eight readbacks and three requests for clarifications.

Looking not to what a reasonable jury could have done, but rather what such a jury is likely to have done in the absence of the evidentiary error (*Beltran*, *supra*, 56 Cal.4th at p. 956), we conclude the length of the jury deliberations does not undermine our determination that there is no reasonable probability the evidentiary error here affected the result. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## IV. Demonstrative Evidence

### A. Additional Background

#### 1. Trial Evidence Concerning the Gate Leading into the Dugout

The little league coach testified on cross-examination he recalled telling an investigator that the way the dugout was locked, his son, who was 85-pounds or smaller, could have gotten through the gate, but he, at five feet eight inches and 230 pounds, could not have.

On cross-examination, the woman who discovered Jessica's body estimated that the size of the opening in the locked gate leading into the dugout was a foot to a foot and a half, and she testified that she did not think she could have easily fit through the opening without touching anything. She was five feet four inches tall "but . . . wouldn't say [she was] slight."

On cross-examination, Deputy Kevin Childs acknowledged that, in performing his measurements at the crime scene, he did not measure the width of the locked gate opening leading into the dugout. He also acknowledged that, while he assumed a detective had measured the opening, he should have done so. Childs also acknowledged the difficulty in judging the size of the opening from photographs, but he estimated the size of that opening as being 14 inches. Asked if he observed anyone at the crime scene passing through that opening, Childs responded that he did not, and agreed that it would be improper to do so because it could disturb the crime scene.

85

Sergeant Tamara Mickelson testified she might be able to enter the gate opening leading into the dugout without disturbing the gate if she took all of her gear off, although she then stated, "I can't say. I don't know." She subsequently testified that she probably would not have been able to enter the dugout through the gate opening without touching the sides. Mickelson was five feet six inches tall and 125 pounds.

Detective Clark examined the gate leading into the dugout. Clark noted in his report that the opening in the gate was at least 16 inches. He further noted that it " 'was clear that someone of average or smaller size could fit in.' " Clark asked someone to measure the opening, but, to Clark's knowledge, it was not measured. Clark believed that, over the course of the approximately eight hours he was at the scene, two people went into the dugout.

Detective Sergeant Belli acknowledged that, at the scene, he entered the dugout while it was still locked. Belli testified that the opening, even with the chain lock on it, was wide enough that he could turn sideways and enter the dugout. Belli testified that he did not disturb any shoeprints on the ground. He further testified that he was wearing gloves at the time, and he took care to avoid leaving any of his DNA or fingerprints on any surfaces. Asked about the purpose of entering the dugout while it was still locked, Belli testified that he had intended to "survey the scene, see if I could locate any evidence, and then also to get an idea of what the scene actually looked like." Belli testified that, as far as he knew, he did not disturb anything when he entered and exited the dugout.

Belli testified that he was six feet tall and weighed 215 pounds at the relevant time. He acknowledged that, when he entered the dugout through the gate, he touched the surrounding surfaces with his hands. He could not recall whether he also touched the surfaces with his body. Belli further acknowledged that he did not tell anyone that he had entered the dugout before it was unlocked until August 24, 2015, approximately three and

86

a half years after the fact. Belli acknowledged that there was no emergency that required him to enter the dugout before the poles and the gate had been searched for fingerprints.

Detective Turnbull testified that he also entered the dugout while it was still locked. He, too, wore gloves when he did so. Turnbull testified that he was approximately five feet 11 inches tall and weighed 230 pounds at the time. On cross-examination, he testified that he did not believe that he disturbed any evidence in entering the dugout. He testified that he was able to enter the dugout without touching the pole, the chain, or anything else of evidentiary value.

Deputy Chad Kato attempted to obtain latent fingerprints from the chain link gate at the entry of the dugout. Kato found no latent prints. He did not perform any analysis on the chain that secured the gate to a vertical post, but he did look for latent prints on both vertical posts. However, by the time Kato performed his analysis, the gate had already been opened. Kato did not process these surfaces for DNA material.

### 2. Defendant's Proposed Demonstrative Evidence

Before the defense began presenting its case, the prosecution objected to proposed defense testimony of Paul Schindler, the defense's private investigator, on the grounds of relevance. According to the prosecutor, Schindler had gone to the baseball diamonds at the park and measured the width of the opening of *an outer gate*, as opposed to an inner dugout gate, and, based on his measurements, the defense purchased a chain.

Defense counsel argued that a "constant issue" in this case was whether defendant "is in the group of people included as those who could enter the dugout." Defense counsel further noted that the size of the opening of the locked gate into the dugout was a contested issue. According to the defense, Schindler had obtained "an identical chain. He's measured it. He's measured a larger fence." Addressing the fact that the defense had not measured "the inner gate," the defense explained it did not have access to that gate. Defense counsel characterized the salient issue as how wide and tall the opening was, and further asserted that Schindler would be able to testify as to those matters.

87

The trial court inquired as to the relevance of Schindler's proposed testimony in light of the fact that "very large men have freely admitted getting through whatever the size of the opening is." Defense counsel responded she did not believe the detectives' testimony that they entered the dugout through the locked gate without touching anything. Defense counsel emphasized that the detectives' representations in this regard did not arise until trial.

The prosecutor objected to the representation that the facsimile chain was identical to the chain at issue, asserting that there was nothing in Schindler's report stating as much, and it was not clear how Schindler could arrive at such a determination. The prosecutor asserted that the outside fence, which provided access to the baseball diamond itself, was not at issue in the case. According to the prosecutor, none of the photographs proffered by Schindler shed any light on the size of the opening of the inner gate which provided access to the dugout. The prosecutor noted that the inner gate "has been replaced. It's not even the same gate as it was back in 2012."

Defense counsel responded that Schindler would testify that all of the chains, with the exception of the newly replaced chain, were identical, and he measured and photographed them. Defense counsel acknowledged that the dugout where Jessica was killed had been replaced and, therefore, the defense was unable to "recreate it on that dugout." However, according to defense counsel, "the other side was not replaced, and remains exactly as it was, and was an identical matching pair." Thus, according to defense counsel, "we are able to look at a gate that was exactly the same as the one that they have now taken away." Defense counsel continued: Schindler "didn't measure the outside gate next to where they entered, the police entered. It was another very similar gate with the chain wrapped around it, which you can see in the exhibits. It was in looking at that the second time that he looked and said, oh, gee, this one is a little bit taller than the one on the inside." Defense counsel further asserted that the defense was not offering Schindler as an expert. Asked whether it was the defense's position that the

88

detectives did not enter the locked gate, despite the fact that defense counsel cross-examined them extensively on their judgment in doing so, defense counsel responded: "My position then was they never did it in the first place.  I don't think any competent investigator in this county and the state would ever do what they say they were doing.  [¶] I say they would do it to include [defendant] as a [person] who could have gotten in the fenced area, and thus committed the crime.  [¶]  They never have said this.  They've been questioned for hundreds of pages in the preliminary hearing.  Clearly, the implication was my client was larger and could not get in."

The court inquired of defense counsel how it could be determined that the chain used by the defense was the same size as the one that had locked the dugout gate. Defense counsel responded that trial testimony established that 11 links in the chain on the dugout measured 14 inches, which was consistent with the chain furnished by the defense.  The court responded:  "if that's true, then we have evidence already as to what the gap would be."  Defense counsel asserted that the gap would actually be a bit larger, and further asserted that the proposed evidence was also relevant to the height and depth of the opening.  Defense counsel asserted that the proposed evidence was relevant to show:  (1) that it would be difficult or impossible for someone of defendant's size to get through the opening, and (2) that law enforcement was willing to make false statements to prosecute defendant.[34]  Defense counsel asserted that the detectives either lied about getting through the gate opening, or destroyed evidence in the process.

---

[34]  As the Attorney General points out, there was no evidence in the trial indicating defendant's height and weight on the day of the murder.  Defendant asserts that testimony of one of the detectives, who appellate counsel characterizes as "recalcitrant," agreed defendant was five foot ten inches.  Defendant further argues that defendant was seated at counsel table "so the jury could visually see for themselves how big he was."  At best, our review of the trial record establishes defendant's height and build was characterized as "average" at the time of trial.  But defendant's size at the time of arrest or when the jury observed him in trial did not establish his height and weight in 2012.  The defense

89

The prosecutor asserted that there was no evidence to establish that the chain offered by the defense was the same as the chain on the gate in 2012. The prosecutor further asserted that Schindler would have no greater expertise than anyone else to opine as to whether or not defendant could have fit through the opening in the gate. According to the prosecutor, a significant amount of time had already been devoted to evidence regarding the size of the gate opening, and "[w]hatever points the defense wished to make on this have been made, and on the grounds of [Evidence Code section] 352, if nothing else, it is time to move on." The prosecutor asserted that "we are going well beyond the grounds of relevance here. It's irrelevant. To the extent that there is any slight relevance to it whatsoever, under 352 we have spent enough time on this issue."

### 3. The Trial Court's Ruling Excluding the Evidence

The trial court ruled: "under 352 we've beat this horse to death over what that opening width is. The prosecution witnesses have testified already consistently with what Mr. Schindler would testify to if given the opportunity. We are just wasting time. [¶] As far as the height of that gate or that chain, it's been apparent from the photographs. The jury will either believe or disbelieve that somebody the size of these detectives could fit through."

### B. Defendant's Contentions

Defendant asserts that the trial court erred in excluding evidence regarding the gate and entry into the dugout that would have impeached law enforcement testimony and raised an inference of a tainted crime scene. Defendant emphasizes that Belli (six feet tall, 215 pounds) and Turnbull (5 feet 11 inches tall, 230 pounds) testified that they could squeeze through gate opening without touching the pole or chain. According to defendant, the implication of their testimony was that, if they could get in, so could

did not establish through witnesses who knew defendant -- for example J.M. or Salvador -- defendant's height and weight in 2012 or whether his size during trial was consistent with his size back then.

90

defendant.  However, defendant maintains that other evidence suggested someone the size of Belli or Turnbull either could not have gotten through the opening, or could not have done so without tainting the crime scene by wiping away evidence.  Defendant asserts that the proposed demonstrative evidence was relevant to impeach the detectives' testimony by showing they could not have gotten through the gate.  He further asserts that this demonstrative evidence was not cumulative because it had greater evidentiary weight and probative value than the evidence already before the jury relevant to this subject.

## C.  Applicable Principles of Law

" 'Demonstrative evidence is evidence that is shown to the jury "as a tool to aid the jury in understanding the substantive evidence." ' " (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1036.)  "Common examples of demonstrative evidence include 'maps, charts, and diagrams' [citation], all of which 'illustrate a witness's testimony.' " (*Ibid*.) "Demonstrative evidence is 'not offered as substantive evidence, but as a tool to aid the jury in understanding the substantive evidence.' " (*Id*. at pp. 1022-1023.)

"To be admissible, demonstrative evidence must satisfy two requirements:  first the evidence must be a reasonable representation of that which it is alleged to portray; and second, the evidence must assist the jurors in their determination of the facts of the case, rather than serve to mislead them." (*People v. Rivera* (2011) 201 Cal.App.4th 353, 363 (*Rivera*).)  "The demonstration must . . . ' "have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence." ' " (*Ibid*.)  " ' "Within these limits, ' "the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time" ' " ' of the reenactment." (*Ibid*.)  A trial court's decision to admit demonstrative evidence is reviewed for abuse of discretion.  (*People v. Duenas* (2012) 55 Cal.4th 1, 21 (*Duenas*).)

## D. Analysis

We conclude that the trial court did not abuse its discretion in precluding this demonstrative evidence. As the People emphasize, defense counsel at trial acknowledged that the measurements Schindler made, and which he proposed to reproduce in demonstrative evidence for the jury, were not made of the gate to the dugout where Jessica was killed, but rather a different gate within the park. Defendant acknowledges as much on appeal, although he asserts that the gate Schindler measured was "illustrative" of the gate to the dugout where Jessica was found, and that the differences could have been explained to the jury. However, we conclude that demonstrative evidence concerning the dimensions of a different gate and a different chain creating a different opening were not sufficiently relevant to the size and shape of the opening to the dugout where Jessica was killed. Defendant failed to make a sufficient showing that the proposed demonstrative evidence was a "reasonable representation of that which it is alleged to portray." (*Rivera, supra*, 201 Cal.App.4th at p. 363.)

In his reply brief, defendant relies on *People v. McDaniel* (1976) 16 Cal.3d 156 (*McDaniel*) for the proposition that "such models in the form of demonstrative evidence need not be built to 'scale' or even be the same as the object in question." In *McDaniel*, the defendant appealed from a judgment convicting him of, inter alia, assault with intent to commit murder (former § 217). (*McDaniel*, at p. 162.) The victim was returning to his house trailer with another person, and, when that other person began to open an inner screen door to the trailer, the trailer exploded from within, causing both men to sustain severe injuries. (*Id*. at pp. 163-164.) At trial, the prosecution was allowed to present evidence in the form of a model bomb prepared by an expert witness. (*Id*. at p. 174.) "The model illustrated how it would be possible by applying pressure to a triggering device to cause an electrical circuit to close and a dynamite cap to detonate, in turn detonating a charge of dynamite. Neither a cap nor dynamite was used in the model, and an electric lamp was used to demonstrate the closing of the electrical circuit when force

92

was applied to the triggering device." (*Ibid.*) The expert testified that "the model he had prepared and the triggering device he had used were not intended to illustrate the mechanism which was actually used to detonate the charge of dynamite in the instant case." (*Ibid.*) There was evidence presented at trial that the defendant had borrowed a clothespin from someone the day before the explosion. (*Id.* at p. 175.) When the defendant objected to the use of a clothespin as the model bomb's triggering device, the expert stated that a clothespin was only one of a number of devices which he could have used, he did not know what triggering device was actually used, and that he used a clothespin only because it was readily available. (*Id.* at pp. 174, 175.)

On appeal, the defendant asserted that the prosecution had failed to establish that the model bomb was "substantially and approximately a model of the type which was exploded in the house trailer," and therefore the trial court committed prejudicial error in permitting the prosecution to present that evidence. (*McDaniel, supra*, 16 Cal.3d at p. 174.) In affirming the judgment, the *McDaniel* court concluded: "Defendant's contentions of undue prejudice by the prosecution's utilization of the model is not supported by the record. The role of the clothespin was not emphasized, and the court carefully kept the use of the model and implications therefrom in proper perspective. There was no abuse of discretion in permitting the use of the model under the conditions imposed by the court. [Citations.] Defendant's further contention that the prosecution failed to establish a proper foundation for admission of the model is not only without merit, but also cannot be urged by defendant for the first time on this appeal." (*Id.* at p. 175, fn. omitted.)

*McDaniel* does not support defendant's contention. The prosecution sought to introduce evidence to demonstrate how an electrical circuit can be closed by a triggering device, causing a dynamite cap to detonate, in turn causing the bomb to explode. (*McDaniel, supra*, 16 Cal.3d at p. 174.) The model employed in *McDaniel* did exactly that. This demonstrated how the bomb used in the crime may have functioned. Here,

defendant did not seek to prove by demonstrative evidence, for example, how a chain and padlock can keep a gate locked, or that a locked chain with sufficient links can leave a gap between the two upright posts around which it is fastened. Instead, defendant here sought to prove *the dimensions of the opening* in the gate leading into the dugout where Jessica was killed. He could not do this by using demonstrative evidence relevant to another chain on another gate creating another opening in another part of the park. In his reply brief, defendant asserts that the proposed evidence "was illustrative of the type of gate and entryway to the dugout where [Jessica] was found." This may be true as far as it goes, and such a proposition may have been supported by *McDaniel*, in which the prosecution sought to prove how the bomb may have functioned. However, here, the defense was not attempting to establish "the type of gate and entryway to the dugout" at issue. The defense was attempting to (1) establish the dimensions of the opening in the locked gate leading into the dugout where Jessica was found to establish that defendant could not have entered through the opening, and (2) impeach the testimony of Belli and Turnbull by establishing either that they could not have passed through the gap or they corrupted the crime scene and destroyed evidence in the process of squeezing into the dugout. In either case, defendant needed to establish not the type of gate involved, but the precise dimensions of the opening in this particular gate, which, the parties agree, no longer exists. A model or facsimile of a different gate was not relevant to this purpose.

A trial court properly applies Evidence Code section 352 in considering whether to admit demonstrative evidence. (*Duenas, supra*, 55 Cal.4th at p. 24 [no abuse of discretion in applying Evid. Code, § 352 to admission of demonstrative evidence].) In precluding the proposed evidence, the trial court essentially ruled that the evidence was cumulative and would require an undue consumption of time.

As the People assert, a number of witnesses testified as to the size of the gate opening leading into the dugout, with their estimates ranging between 14 inches and 20 inches, several photographs were submitted into evidence depicting the locked gate and

94

the opening leading into the dugout, and several witnesses testified as to whether or not they could or did fit through that opening. Under these circumstances, and particularly in light of the lack of relevance and thus lack of probative value of the proffered evidence, we conclude that the trial court did not abuse its discretion in concluding that the evidence was cumulative and any probative value of the evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time. (Evid. Code, § 352; *People v. Burgener* (1986) 41 Cal.3d 505, 525, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756 [cumulative evidence is excludable under Evid. Code, § 352 on the basis that its admission will necessitate undue consumption of time]; *People v. Filson* (1994) 22 Cal.App.4th 1841, 1850, disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452 [Evid. Code, § 352 allows for the exclusion of cumulative evidence if it would necessitate undue consumption of time].)

Defendant asserts that the evidence should not have been excluded as cumulative because the proffered evidence would have had greater evidentiary weight or probative value than the evidence before the jurors. However, as we have concluded, the proffered demonstrative evidence was irrelevant and thus lacked probative value. Also, given the differences, under Evidence Code section 352, the proposed demonstration also had the potential of misleading the jury, the danger of which substantially outweighed any probative value.

Defendant argues the evidence had additional probative value because it would have impeached Belli's and Turnbull's testimony as to whether they did, in fact, enter the dugout through the locked gate, or, if they did so, whether they managed to do so without destroying evidence. However, demonstrative evidence depicting a *different* gate, not necessarily of the same dimensions, would not have had impeachment value.

Moreover, there was already evidence before the jury contradicting or undermining Belli's and Turnbull's testimony that they were able to enter the dugout

95

through the locked gate.  The woman who found Jessica's body, who was five feet four inches tall "but . . . wouldn't say [she was] slight," testified that she did not think she could have easily fit through the opening without touching anything.  Sergeant Mickelson testified she was five feet six inches and 125 pounds, that Turnbull and Belli were bigger than she was, and that she probably would not have been able to enter the dugout through the gate opening without touching the sides.  Detective Clark testified that " 'someone of average or smaller size could fit in.' "

Because the proffered demonstrative evidence lacked probative value, was cumulative, its presentation would necessitate undue consumption of time, and it created a danger of misleading the jury, we conclude that the trial court did not abuse its discretion in excluding the evidence.

## V.  Pinpoint Instruction on Third Party Culpability

### A.  Additional Background

Defendant filed a motion seeking a pinpoint instruction on third party culpability. Based on the assertion that the defense had presented substantial evidence to show that S.L. and/or Christopher had killed Jessica, defendant requested that the trial court instruct the jury with the following language:

"You have heard evidence that [S.L.] and/or Christopher . . . killed [Jessica].  The defendant is not required to prove the guilt of [S.L.] and/or Christopher . . . .  It is the prosecution which has the burden of proving that [S.L.] and/or Christopher . . . did *not* kill [Jessica], and that the defendant is guilty of the offense beyond a reasonable doubt. [¶]  Evidence that [S.L.] and/or Christopher . . . committed the charged offense may, by itself, leave you with a reasonable doubt as to the defendant's guilt.  Its weight and significance are matters for your determination.  If, after considering all of the evidence, including any evidence that [S.L.] and/or Christopher . . . killed [Jessica], you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

96

At a conference on the jury instructions, the trial court stated it found potentially persuasive the cases relied upon by the prosecution, concluding that instructions like the pinpoint instruction offered by the defense were argumentative and redundant. However, the trial court noted that those cases were decided prior to the change from CALJIC to CALCRIM, and the court wanted to do additional research. The trial court continued: "the defense-proffered instruction, in the form that it's in, would not be given. And it seems that the ultimate issue is whether the jury is to hear that the defendant has no burden to prove anything, and that the People have a burden to basically disprove anything offered by the defense. [¶] I haven't stated that perfectly, but that seems to be where the issues -- it seems to be where the disagreement exists. [¶] The bottom line is that if the defense can come up with a more generic instruction, and explain to the Court why the cases cited by the People shouldn't be considered by the Court, that would be the helpful direction to go in. Otherwise, the Court would be of a mind to accept the People's proffered instruction, which would add the last sentence of [CALCRIM No.] 315 to standard [CALCRIM No.] 220 on reasonable doubt."

Subsequently, the court stated in a tentative ruling that it would give CALCRIM No. 220 without any changes, and then add a sentence reading: " 'The defendant need not prove that he is not guilty, or that someone else is guilty,' " and then add the last paragraph of CALCRIM No. 315, which reads: " 'The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.' " The court stated that this was its "tentative approach to providing a nonargumentative instruction that directs attention to the defense's theory of the case."

Defense counsel protested that, without a pinpoint instruction, the jury may not know how to assess the information placed before it by the defense. Defense counsel expressed the concern that the jury might believe that the defense had to prove that it was S.L. or Christopher or someone else who killed Jessica in order to acquit defendant.

97

While defense counsel agreed with the language that the trial court proposed adding in addition to CALCRIM No. 220, counsel proposed keeping CALCRIM No. 220 as it was and adding the additional language as a pinpoint instruction.

The prosecution objected to the addition of the proposed language. The prosecutor emphasized California Supreme Court case law holding that an instruction stating it is not necessary for the defendant to prove that another person may have committed the crime and it is not the defendant's burden to prove his or her innocence was redundant in light of standard jury instructions. The prosecutor asserted that, once the court begins repeating concepts over and over again, it becomes an advocate. The prosecutor contended that CALCRIM No. 220, plus the last sentence from CALCRIM No. 315, sufficiently explained the burden of proof, and asserted that "[w]e don't have to say it the other way around. If we are doing that, we are just hammering the same point home."

Defense counsel asserted that there was no third party culpability instruction in CALCRIM, and, therefore, a pinpoint instruction on third party culpability could not be redundant. Counsel disagreed that such an instruction would make the court an advocate.

The prosecutor replied that the absence of a third party culpability instruction from the CALCRIM instructions demonstrated that the issue is covered by the standard instructions, and there is no need for a separate instruction on the matter.

The trial court stated that it would amend its tentative decision. It ruled that it would give the jury CALCRIM No. 220 and the last paragraph of CALCRIM No. 315. The trial court stated that it would not read the language stating: " 'The defendant need not prove that he is not guilty, nor that someone else is guilty.' " The trial court relied on case law for the proposition that third party culpability is not an affirmative defense, but rather relates to the general issue of reasonable doubt.

Thereafter, the trial court instructed the jury with CALCRIM No. 220, plus the additional paragraph from CALCRIM No. 315 (shown in italics), as follows:

98

"The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. [¶] *The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty*."

During deliberations, the jury submitted a note to the court which read as follows: "We have a juror who insists on finding who else has been at the park. Go to a 'shadow of a doubt' vs 'reasonable doubt.' "Requires" us to 'what if' every possible scenario. [¶] Can we get clarification on if this is what we should do?"

In its written response, the trial court stated: "In response to your Request No. 8, I must be careful in my reply, because as I have already instructed, '[y]ou must decide what the facts are. It is up to all of you, and you alone, to decide what happened . . . .' [Citation.] You are the exclusive judges of the facts in this case, and I cannot interfere - or even appear to interfere - in your deliberations. With respect to the legal questions you pose, however, I would remind you that your decision must be 'based only on the evidence that has been presented to you in this trial.' [Citation]. You cannot base your

99

decision on anything outside of the record in this case. While you may draw reasonable inferences from the evidence produced in this courtroom, you may not speculate about matters outside of the record. And the burden of proof in this case is proof beyond a 'reasonable doubt.' [Citation]. While you may have heard the term 'shadow of a doubt' from literature or from some other source, it is not the standard that is applied in this courtroom, or in any other courtroom in the United States. In these and in all other instances, you are bound by the law which I have given you in these instructions. You may not substitute any other standard for those I have given you, and you 'must follow the law as I explain it to you, even if you disagree with it.' "[35]

## B. Defendant's Contentions

Defendant asserts that the trial court erred in refusing to give the pinpoint instruction on third party culpability. He emphasizes that third party culpability was his defense, and asserts that the instructions given to the jury failed to adequately inform the jurors that the defense does not carry any burden of proof as to third party culpability evidence. Defendant asserts that the trial court erred in refusing to instruct the jury on third party culpability on the grounds that third party culpability is not an affirmative defense, and that the reasonable doubt standard adequately covered the issue. According to defendant, he produced substantial evidence of third party culpability, and therefore, upon his request, he was entitled to the pinpoint instruction. Defendant asserts that the trial court's ruling deprived him of his constitutional right to a jury instruction on his theory of the case.

## C. Analysis

As a general matter, a criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense when the instruction is supported by substantial

---

[35] Defendant does not contend that the trial court's thoughtful response was erroneous.

evidence. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142, citing *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) "But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.) In general, we review a claim of instructional error de novo. (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 751.)

In *People v. Hartsch* (2010) 49 Cal.4th 472 (*Hartsch*), the defendant proposed two instructions related to third party culpability. Proposed instruction I stated, in pertinent part: " 'If the evidence presented in this case convinces you beyond a reasonable doubt that the defendant is guilty, you should so find, even though you may believe that one or more other persons are also guilty. [¶] On the other hand, if you entertain a reasonable doubt of the defendant's guilt after an impartial consideration of the evidence presented in the case, including any evidence of the guilt of another person or persons, it is your duty to find the defendant not guilty.' " (*Id.* at p. 504.) Proposed instruction Z stated: " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged. In this regard, it is not required that defendant prove this fact beyond a reasonable doubt. [¶] The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Ibid.*)

Discussing these proposed instructions, our high court in *Hartsch* stated: "We have noted that similar instructions add little to the standard instruction on reasonable doubt. [Citation.] We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that

101

evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Hartsch, supra*, 49 Cal.4th at p. 504.)

Such is the case here as well. Defendant's proposed instruction added little to the modified instruction given by the trial court on reasonable doubt. Consequently, omission of defendant's proposed instruction was not prejudicial because the trial court's reasonable doubt instruction allowed defendant to impress upon the jury his contentions regarding the liability of S.L. and/or Christopher and that their potential liability should give rise to a reasonable doubt as to defendant's guilt.

Moreover, defendant's proposed instruction here was argumentative. It bears a strong similarity to the defendant's proposed instruction Z in *Hartsch*. The first sentence of instruction Z in *Hartsch* stated: " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) The *Hartsch* court concluded that this instruction was argumentative "because it *told* the jury that evidence 'indicat[ed] or tend[ed] to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged,' " and further stated that it "is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence." (*Ibid.*)

The beginning of defendant's proposed instruction is even more problematic in this regard. It stated: "*You have heard evidence that* [*S.L.*] *and/or Christopher . . . killed* [*Jessica*]. The defendant is not required to prove the guilt of [S.L.] and/or Christopher . . . ." The italicized language is far more argumentative than the instruction in *Hartsch*, inasmuch as it would have told the jury that there was evidence *that actually proved* S.L. or Christopher killed Jessica, as opposed to the *Hartsch* instruction Z language which only referenced evidence which *indicated or tended to prove* that someone else committed the charged offenses. (*Hartsch, supra*, 49 Cal.4th at p. 504.)

102

Additionally, defendant's proposed instruction was duplicative in much the way the second sentence of the *Hartsch* instruction Z was. As noted, the *Hartsch* proposed instruction read: " 'In this regard, it is not required that defendant prove this fact beyond a reasonable doubt.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) The middle portion of defendant's proposed instruction was similar, stating: "The defendant is not required to prove the guilt of [S.L.] and/or Christopher . . . . It is the prosecution which has the burden of proving that [S.L.] and/or Christopher . . . did *not* kill [Jessica], and that the defendant is guilty of the offense beyond a reasonable doubt. [¶] Evidence that [S.L.] and/or Christopher . . . committed the charged offense may, by itself, leave you with a reasonable doubt as to the defendant's guilt." Both the *Hartsch* instruction and that proposed by defendant were duplicative of the reasonable doubt instruction, as they repeated the admonishment that it is the prosecution that bears the burden of proving a defendant's guilt beyond a reasonable doubt.

Finally, proposed instruction Z in *Hartsch* ended: " 'The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) Similarly, defendant's proposed instruction ended with: "Its weight and significance are matters for your determination. If, after considering all of the evidence, including any evidence that [S.L.] and/or Christopher . . . killed [Jessica], you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty." These passages are almost identical to the *Hartsch* instruction. The only substantive departure between the two is that, unlike proposed instruction Z in *Hartsch*, the proposed instruction here again returns to argument, discussing "any evidence that [S.L.] and/or Christopher . . . killed" Jessica.

103

Defendant attempts to distinguish *Hartsch*, asserting that "[t]he infirmity in the *Hartsch* instruction was its failure to limit the instruction to a person against whom there was evidence that he or she committed the crime," and that "[i]t cannot be argumentative to give the precise level of specificity required by the Court in *Hartsch*." We do not agree with defendant's characterization of *Hartsch*. Nowhere in *Hartsch* does our high court rely on this basis as a ground for determining that proposed instruction Z was inappropriate. It may be a distinction between this case and *Hartsch* that, here, the proposed instruction specifically identified the subjects of defendant's third party culpability theory. However, our high court in *Hartsch* did not rely on this as a basis for concluding that proposed instruction Z was defective or unnecessary. Instead, the grounds on which our high court relied were (1) the fact that it was redundant with the standard reasonable doubt instruction, and (2) that it was argumentative because, similar to defendant's proposed instruction here, it "*told* the jury that evidence 'indicat[ed] or tend[ed] to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged,' " and (3) because it "is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence." (*Hartsch, supra*, 49 Cal.4th at p. 504.)

Defendant's proposed pinpoint instruction suffers from the same shortcomings as proposed instructions in *Hartsch*. It adds little to the standard instruction on reasonable doubt, especially as modified by the trial court, and is redundant in that it restates that standard. And defendant's proposed instruction was impermissibly argumentative. The trial court did not err in refusing to give defendant's proposed instruction.

## VI. Cumulative Error

Defendant asserts that the judgment should be reversed due to cumulative error. According to defendant, even if we find individual errors to be harmless, the cumulative effect of these alleged errors deprived him of a fair trial. We reject this contention.

104

The premise behind the cumulative error doctrine is that while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) We have concluded that defendant's claims of error are without merit with the exception of the error related to the limitation of the gang expert testimony, where we have found the error to be harmless. We have reviewed all of defendant's claims and find no cumulative prejudicial error warranting reversal. Defendant was not deprived of a fair trial.

## VII. Newly Discovered Evidence Contention

### A. Additional Background

Defendant moved for a new trial on several grounds, including newly discovered evidence. He stated that, on October 5, 2015, defense counsel and a defense investigator, Schindler, met with Joseph Madigan, a Sacramento County jail inmate, who had indicated he had information relevant to this case and was willing to meet with the defense. Madigan told the defense he knew the people who hang out at Vince's Motel and Casa Linda Motel, and that, in April 2013, he had visited Johnny T., Christopher's brother. Johnny told Madigan that, on the night of Jessica's death, S.L., Christina, and Christina's boyfriend asked Christopher to bring blankets to the park. When Christopher arrived at the park, S.L., Christina, Christina's boyfriend, and two other individuals were standing near the body of a young girl. Christopher left the park. According to Madigan, sometime after defendant's arrest, Madigan and his sister confronted Christina at Casa Linda Motel with the information he learned from Johnny. She denied being involved in the death of Jessica, and stated, " 'someone already took the fall for it.' "

Defense counsel and Schindler contacted Suzanne in an effort to locate Johnny. Suzanne indicated she had recently spoken with Johnny, who told her that, on the night of Jessica's death, S.L., Christina, and Christina's boyfriend called Christopher and asked him to bring blankets to the park. When Christopher arrived at the park, the three were standing near the body of a dead girl. Christopher left.

105

Thereafter, Schindler spoke with Johnny, who provided a similar account to those offered by Madigan and Suzanne. Johnny agreed to sign a declaration.

When Schindler was finally able to locate Christopher, he shared similar information to what Schindler had learned from the other witnesses. Christopher indicated that he was "extremely fearful" of S.L., Christina, and Christina's boyfriend, and also expressed fear that the prosecutor would attempt to blame him for the murder. According to the defense's representation, Christopher agreed that it was wrong for defendant to be imprisoned for a murder he did not commit. Christopher agreed to sign a declaration stating that he had gone to the park with blankets after S.L. called him. However, Christopher "insisted on redacting the names of the responsible individuals . . . ."

Defendant asserted that, had Christopher testified to this information at trial, there is a reasonable probability that the outcome of the trial would have been different. Defendant asserted that such testimony would have corroborated the trial testimony of Connie, Suzanne, and Michelle.

Defendant submitted declarations purportedly signed by Johnny, Christopher, and Schindler in support of his new trial motion.

In opposition to defendant's motion, the prosecution stated that, within 24 hours of receiving defendant's motion, investigators with the district attorney's office interviewed Christopher, Johnny, his wife, and Madigan. According to the prosecution, "[e]very single one of these witnesses has denied – on tape – the truth of the allegation that [Christopher] showed up at the park with a blanket or blankets, and saw people standing around a body." Additionally, Christopher and Johnny denied signing the declarations for the defense. Madigan admitted making his statement to the defense, but "Madigan now also admits that that statement was not true." According to the prosecution, Madigan agreed to make the statement "after he and the defendant had agreed to help each other out – a false statement in exchange for money on Mr. Madigan's books." The

106

prosecution asserted that the allegedly newly discovered evidence would not render a different result probable upon retrial.

At a hearing on the motion, the prosecution emphasized that the witnesses "all deny having signed the declarations provided by the defense, the two that we are talking about. And of course the inmate who initially got this all started has indicated that he made it up." The prosecutor further asserted that "this is not new evidence" because the parties fully litigated whether Christopher spent the night of Jessica's death at Vince's Motel or whether he instead left the motel.

The trial court afforded the defense additional time to respond to the claims that the declarations were signed by individuals other than the purported declarants and stated that it wanted to read the defense's reply brief. The matter was continued to the following Monday.

When the trial court reconvened, the prosecution argued that Christopher's purported signature on the declaration "bears no semblance to the known signature of" Christopher, and further emphasized that Christopher denied signing the declaration or making any of the statements contained in it. The prosecutor also asserted that Johnny's purported signature on his declaration did not match his known signature, and he denied hearing what was recounted in the declaration. Additionally, the prosecutor emphasized that Madigan "indicated that this was all a lie. He made this up." The prosecutor noted that it was possible that, if defendant's new trial motion were granted, Christopher could again assert his rights under the Fifth Amendment, leaving the parties "exactly back where we started from." (See fn. 28, *ante*.) The prosecutor further asserted that Christopher had offered so many accounts of what happened on the night Jessica was killed, his testimony would be of very limited probative value. The prosecutor maintained that the new evidence proffered by the defense would not render a different result probable on retrial.

In reply, defense counsel argued that the witnesses' recantation was not unusual. However, defense counsel did acknowledge that the signatures on the declarations looked different from the signatures used as exemplars.

The trial court denied defendant's new trial motion, ruling that the new evidence proffered by the defense would not render a different result probable.

### B. Defendant's Contentions

Defendant asserts that the trial court abused its discretion in denying his motion for a new trial based on newly discovered evidence, and that this error violated his right to due process. Defendant contends that he made a sufficient showing that it was probable that at least one juror would have voted to acquit him if the newly discovered evidence was presented.

### C. Standard of Review and Applicable Legal Principles

" ' " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108 (*McCurdy*); *People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Turner* (1994) 8 Cal.4th 137, 212 (*Turner*), quoting *People v. Sutton* (1887) 73 Cal. 243, 247-248 (*Sutton*) & *Delgado, supra*, 5 Cal.4th at p. 328.) As defendant notes, " 'a motion for a new trial should be granted when the newly discovered evidence contradicts

the strongest evidence introduced against the defendant . . . .' " (*Delgado*, at p. 329, quoting *People v. Martinez* (1984) 36 Cal.3d 816, 823.)

" ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' " (*Delgado, supra*, 5 Cal.4th at p. 328.) The " 'trial court's factual findings, express or implied, made on a motion for new trial will be upheld if supported by substantial evidence.' " (*People v. Cua* (2011) 191 Cal.App.4th 582, 609 (*Cua*), quoting *People v. Drake* (1992) 6 Cal.App.4th 92, 97 (*Drake*).)

### D. Analysis

Even when a defendant establishes the above listed factors, " 'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' " (*Delgado, supra*, 5 Cal.4th at p. 329.)

We conclude that, in addition to any obstacles defendant would face with regard to the admissibility of the newly discovered evidence, the credibility and probative value of that evidence was severely undermined given Christopher R.'s, Thomas's and Johnny's insistence that they did not execute the declarations, the fact that the signatures on those declarations did not appear to match the signatures of the individuals who purportedly signed them, and Madigan's statement that he fabricated his story in exchange for money on his jail books and because he was angry at Johnny. Therefore, we conclude that the trial court was well within its discretion in finding that the asserted new evidence would not have changed the result on retrial. Inasmuch as the trial court impliedly determined that the newly discovered evidence lacked credibility, that finding is supported by substantial evidence and will be upheld. (See *Cua, supra*, 191 Cal.App.4th at p. 609; *Drake, supra*, 6 Cal.App.4th at p. 97.)

Defendant maintains that "the trial court necessarily presumed that the 'proffered new evidence' was credible; otherwise there would have been no need for the court to

essentially rule 'that [the] *proffered new evidence* would not render a different result probable." We do not think the inference defendant draws here is warranted. Indeed, as our high court stated in *Delgado*, " 'the trial court may consider the credibility as well as materiality of the evidence *in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable*.' " (*Delgado, supra*, 5 Cal.4th at p. 329, italics added.) The mere fact that the trial court determined that the newly proffered evidence would not render a different result reasonably probable on retrial does not mean that the trial court found or presumed the evidence credible. The trial court could have determined that the newly discovered evidence would not have rendered a different result probable because that evidence so lacked in credibility.

We conclude that the trial court did not abuse its discretion in denying defendant's new trial motion grounded on newly discovered evidence. This determination cannot be said to have constituted a manifest and unmistakable abuse of discretion. (See *McCurdy, supra*, 59 Cal.4th at p. 1108; *Delgado, supra*, 5 Cal.4th at p. 328.)

## VIII. Review of Sealed Juror Information Related to Allegation of Juror Misconduct

### A. Additional Background

The defense filed a post-verdict motion addressing alleged jury misconduct.[36] The defense indicated that it was seeking compelled authorization granting access to Juror No. 4's Twitter account based on pre-verdict tweets written by her indicating she violated the court's instructions not to "share information" about the case by any means of communication, not to talk about the case with anyone, not to discuss the deliberations with anyone, and not to communicate with anyone during deliberations.

---

[36] Defendant's written motion does not appear in the record on appeal. However, because defendant's contentions are clearly based on oral argument before the trial court, and because we are performing our own independent review of the relevant materials, we do not need defendant's original written motion to resolve this issue.

The prosecution asserted that Juror No. 4's pre-verdict tweets were innocuous, at most amounted to trivial violations of the trial court's orders, and did not amount to misconduct, let alone prejudicial misconduct. The prosecution further argued that Juror No. 4's tweets did not demonstrate juror bias.

In a tentative ruling, the trial court stated that it intended to make a limited inquiry of Juror No. 4, and that the inquiry could possibly disclose information sufficient to warrant an order compelling that juror to authorize access to the juror's social media accounts. Subsequently, the court characterized Juror No. 4's pre-verdict tweet as misconduct, stating that it had to proceed to determine whether the misconduct was prejudicial. The prosecutor opposed a hearing on the issue, asserting that, if there was any prejudice resulting from Juror No. 4's tweet, it was prejudicial to the prosecution.

The trial court adopted its tentative ruling. The trial court emphasized that Juror No. 4's tweet violated the court's orders and instructions, which amounted to misconduct.

The trial court reconvened on a subsequent date, at which time Juror No. 4 was present and represented by appointed counsel. The trial court stated, "Given that the existence of the tweets, according to [*Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854 (*Juror Number One*)], constitutes misconduct, the Court feels compelled to further explore the Twitter account from which those tweets emanated." Appointed counsel for Juror No. 4 indicated that, as discussed in chambers, Juror No. 4 would assert her right-to-privacy objection, the court would make its ruling, ordering her to execute a waiver over her objection and granting Juror No. 4 use immunity, and Juror No. 4 would then execute the waiver and cooperate with the trial court. After Juror No. 4's counsel asserted her right-to-privacy objection, the trial court ordered Juror No. 4 to sign a waiver of her right to privacy and granted her use immunity.

Eventually, Twitter provided the trial court with records from Juror No. 4's account which the trial court reviewed in camera. Following the completion of its in camera review, the trial court stated, in its tentative ruling, that its investigation "has

111

revealed no evidence whatsoever of any prejudice that would attach to the Juror No. 4's use of social media during the time that she was a sworn juror, and consequently is terminating its investigation with that finding."

At a subsequent hearing, the trial court stated it had made the initial finding of juror misconduct based on the use of social media during trial, which gave rise to a rebuttable presumption of prejudice. The court stated that "it was the investigation as to that rebuttal of presumption from which the Court started." The court stated that, upon reviewing the undisclosed, sealed tweets, "they turned out to be nothing more than mental musings put on social media, so there is no evidence whatsoever of prejudice. That presumption has been rebutted." The court went on to say, "the allegation of juror misconduct has been fully investigated, and found that there is no juror misconduct based on that investigation."

Defendant requests that we conduct an independent, in camera review of the sealed juror information reviewed by the trial court. He requests that this court perform a *Pitchess*-type[37] review to determine whether the finding of misconduct and the presumption of prejudice were rebutted. The People do not oppose defendant's request. We grant defendant's request.

### B. Analysis

Misconduct by a juror usually raises a rebuttable " 'presumption' of prejudice." (*In re Hamilton* (1999) 20 Cal.4th 273, 295 (*Hamilton*).) "Still, whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and

---

[37] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

112

the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Id*. at p. 296.)

Having reviewed the materials filed under seal, we conclude that the trial court's determination is supported by the record. Not only were these tweets mere "mental musings," but they had nothing to do with this case. The entire record and all surrounding circumstances indicate that there is no substantial likelihood that Juror No. 4 was actually biased against defendant. (See *Hamilton, supra*, 20 Cal.4th at p. 296.)

### DISPOSITION

The judgment is affirmed.

                                     /s/
                                 MURRAY, J.

We concur:

     /s/
HULL, Acting P. J.

     /s/
DUARTE, J.